## CAMINETTI v. UNITED STATES.

## DIGGS v. UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

## HAYS v. UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 139, 163, 464. Argued November 13, 14, 1916.—Decided January 15, 1917.

The White Slave Traffic Act of June 25, 1910, c. 395, 36 Stat. 825, applies to any case in which a woman is transported in interstate commerce for the purpose of prostitution or concubinage; pecuniary

gain, either as a motive for the transportation or as an attendant of its object, is not an element in the offenses defined.

As so read the act is constitutional.

When the language of a statute is plain and does not lead to absurd or impracticable results, there is no occasion or excuse for judicial construction; the language must then be accepted by the courts as the sole evidence of the ultimate legislative intent, and the courts have no function but to apply and enforce the statute accordingly.

Statutory words are presumed, unless the contrary appears, to be used in their ordinary sense, with the meaning commonly attributed to them.

When an act provides that it shall be known and referred to by a designated name, the name can not be made the means of overriding the plain meaning of its other provisions.

The reports of congressional committees may be resorted to by the courts when the legislation to which they relate is doubtful and requires interpretation.

The meaning which this court had attributed to the words "any other immoral purpose" as used in the act concerning the importation of alien women, Act of February 20, 1907, c. 1134, 34 Stat. 898, 899, Congress must be presumed to have known when it employed the same words in a similar association in the White Slave Traffic Act.

The power of Congress under the commerce clause, including as it does authority to regulate the interstate transportation of passengers and to keep the channels of interstate commerce free from immoral and injurious uses, enables it to forbid the interstate transportation of women and girls for the immoral purposes of which the petitioners were convicted in these cases.

When an accused person voluntarily testifies in his own behalf and omits to deny or explain incriminating circumstances and events already in evidence in which he participated and concerning which he is fully informed, his silence subjects him to the inferences naturally to be drawn from it, and an instruction to that effect does not violate his rights under the Fifth Amendment or the Act of March 16, 1878, c. 37, 20 Stat. 30.

While it is the better practice in criminal cases for courts to caution juries against too much reliance on the testimony of accomplices and against believing such testimony without corroboration, mere failure to give such an instruction is not reversible error.

220 Fed. Rep. 545; 231 Fed. Rep. 106, affirmed.

THE cases are stated in the opinion.

*Mr. Joseph W. Bailey*, with whom *Mr. Marshall B. Woodworth* and *Mr. Robert T. Devlin* were on the brief, for petitioner in No. 163:

It was error to charge the jury that they might draw inferences against the defendant Diggs, from his failure to deny or explain incriminating acts in evidence. Constitution, Article V; Act of March 15, 1878, c. 37, 20 Stat. 30; *Balliet* v. *United States*, 129 Fed. Rep. 689, 696; *Myrick* v. *United States* and *Cunningham* v. *United States*, 219 Fed. Rep. 1; *Boyd* v. *United States*, 116 U. S. 616. In the United States courts and in the courts of some of the States, independently of statute, and especially in California, the right of cross-examination is restricted to matters inquired of in chief. Where a defendant does not go into a subject, but leaves it as the prosecution left it, the case as made against him derives no support from his silence. The fact, therefore, that defendant went upon the stand in this case did not justify the instructions complained of.

The practical effect was erroneously to contradict the presumption of innocence and shift the burden of proof.

The evidence authorized the jury to conclude that the women were accomplices. Cyc., vol. 12, pp. 447, 448, and cases cited; *People* v. *Coffey*, 161 California, 433, 447; *United States* v. *Holte*, 236 U. S. 140. It was the duty of the trial court to submit that question and to caution the jury. Cyc., vol. 12, p. 453; *Crawford* v. *United States*, 212 U. S. 183, 204, and numerous other cases. A refusal so to instruct is ground for reversal. *Solander* v. *People*, 2 Colorado, 48; *Cheatham* v. *State*, 67 Mississippi, 335; *People* v. *Sternberg*, 111 California, 11; *People* v. *Strybe*, 36 Pac. Rep. 3; *People* v. *Bonney*, 98 California, 278; Penal Code of California, § 1111; *Martin* v. *State*, 36 S. W. Rep. 587; Cyc., vol. 12, pp. 458, 459, and cases cited.

The issue should have been confined to the specific allegation of purpose, viz., that the woman was to become the defendant's concubine or mistress, which controls the

general terms "debauchery" and "other immoral purposes," in the indictment. For the meaning of "debauchery" see *State* v. *Reeves*, 97 Missouri, 668; *Suslak* v. *United States*, 213 Fed. Rep. 913, 917; *Athanasaw* v. *United States*, 227 U. S. 326. It is unnecessary for us to particularize the many indecent practices that come under the head of "debauchery" and "other immoral practices." It was for the purpose of reaching these that the act was passed.

See: "The Battle with the Slums," pp. 69–75, by Jacob A. Riis, N. Y., The Macmillan Company, 1902.

The case should be reversed for introduction of improper evidence and misconduct of counsel at the trial.

The trial court erred in compelling the defendant on cross-examination to go beyond his direct examination.

The White Slave Traffic Act is unconstitutional if extended to cases where no element of profit exists. *New York* v. *Miln*, 11 Pet. 102; *License Cases*, 5 How. 599; *Bowman* v. *Chicago &c. R. Co.*, 125 U. S. 489; *Lemon* v. *People*, 26 Barbour (N. Y.), 270, affirmed in 20 N. Y. 562; *Welton* v. *Missouri*, 91 U. S. 275; *Hall* v. *DeCuir*, 95 U. S. 485; *Weber* v. *Virginia*, 103 U. S. 344; *Passenger Cases*, 7 How. 283; *King* v. *American Transportation Co.*, 14 Fed. Cases, 512; *Boyse* v. *Anderson*, 2 Pet. 150. All cases heretofore upholding the law have involved actual traffic in women for gain. This traffic, as the court knows judicially, became so menacing that a conference of nations was convened at Paris, July 25, 1902, to concert measures of suppression. The resulting agreement was proclaimed by the President June 18, 1908, 35 Stat. pt. 2, 1979–1984. This the act of Congress was intended to effectuate. The nature of the white slave traffic and the meanings of the term are generally and judicially known. See New Standard Dictionary; *United States* v. *Hoke*, 187 Fed. Rep. 992, 1002. The court should take cognizance of the evil aimed at by the act. The Paris agreement, the proclamation, the

act itself in the title and §§ 6 and 8, and the committee's report all demonstrate that commercial traffic alone was in view. Commerce in the Constitution implies traffic and gain. Congress cannot regulate morals and thus usurp the state police power by forbidding the mere passage or transportation of passengers.

The following is a condensation of *Mr. Bailey's* petition for rehearing in the Caminetti Case.

The White Slave Traffic Act does not apply to the uncontested facts of this case. The question here is whether the purpose of Caminetti, being free from every element of coercion and commercialism, is within the prohibition of the statute. It is a question of classification, rather than of words. An act might be clearly within the language of a statute directed against voluntary vice, and yet that identical act would not be within precisely the same words in a statute directed against involuntary vice. Before we can decide whether a particular act is within the words of a statute, we must first decide whether the class of acts to which the particular act belongs is within the purpose of the statute. This principle of construction was sanctioned by this court in *Holy Trinity Church* v. *United States*, 143 U. S. 457, and the rule there announced has been received by the bench and bar as the law of the land for more than twenty years. In that case the court held that although the contract of employment was within the letter of the law, emphasized by particular expression, as well as by certain exceptions, Congress intended only to legislate against the importation of manual laborers under contract, and intellectual laborers were not within the statute. Here we say that Congress intended to legislate only against commercialized vice, and no conduct, however immoral, which is free from coercion and commercialism, is within the statute.

How did this court reach the conclusion that the Contract Labor Law includes only those who work with their hands, and not those who work with their brain? It did so by. taking into account the title of the act, the evils which it was sought to remedy, the circumstances surrounding the appeal to Congress, and the report of the committee recommending its enactment. If it was proper to consider such matters in ascertaining the scope of a law which enforces its prohibitions by moderate fines, certainly the same course is even more proper with respect to a law which makes the citizen who violates it a felon; and as this court consulted the committee report in construing the Contract Labor Law, *a fortiori* it ought to adopt the same method in construing the White Slave Traffic Act, which, as it has been construed in this case, is the most drastic criminal law ever enacted by the American Congress. If there be any difference, the language was plainer in that case than in this. As there are no exceptions to accentuate the inclusion of all classes not specially excepted, we are justified in thinking that, even more than in the other case, the court ought to consider the report of the committee which prepared the White Slave Traffic Act.

The rule for construing statutes as announced in the *Holy Trinity Church Case* was not modified by the decision in *United States* v. *Bitty*, 208 U. S. 391. There was a difference in the facts of the two cases, and not any difference in the logic of the court. In the first case the court held that the contract was not within the statute, because, although within the letter of it, it was not within the purpose of it; and in the second case the court held that the offense was within the statute, because it was within both the letter and the purpose of it.

The court did not, in *United States* v. *Bitty*, consider the report of a congressional committee, for the very sufficient reason that there was no report from which the court

could have extracted the real meaning of the later law. If this court gathered the intention of Congress from the words of the statute in the Bitty case, it nevertheless sought the meaning of those words in the history of that statute. Mr. Justice Harlan devoted the first part of his opinion to a review of the legislation, which began with the Act of March 3, 1875—that being the first law which prohibited the importation of alien prostitutes—was followed by the Act of March 3, 1903, which still further enlarged the prohibitions, and culminated in the Act of February 20, 1907, where the words "or for any other immoral purpose" first appear. Those previous acts were reproduced in order to show by the successive changes in the law the purpose which Congress had in mind. I cannot perceive any difference in principle between investigating the history of a law and examining the report of a committee for the purpose of ascertaining whether Congress intended that the statute should include a certain class of persons or offenses.

Section 1 must be read in connection with § 8. Congress had some purpose in giving the statute a name, and the only imaginable purpose was to indicate the character of offenses which it was intended to punish. We must, therefore, so read the entire act as to give effect to that purpose, or we must find some other purpose which we can reasonably ascribe to Congress. If we are not able to discover any other purpose—and I cannot imagine any other—then it follows necessarily that the language of § 1 is limited by § 8 to cases within "the designation or description" of the latter. Certainly we cannot suppose that Congress, even though its only purpose was to give a name to this act, intended it to include offenses which the name clearly excludes. If Congress intended to include in this act cases of naked immorality, without any element of commerce or coercion, then to call it the "White Slave Traffic Act" was a misnomer; and we can hardly assume

that Congress would take the trouble of formally bestowing a name upon a statute and then misname it.

But while § 8, if regarded only as giving a name to the statute, must confine the language of § 1 to cases within the "designation or description" of the name thus given, I think it does more than merely christen the law. Its form and its phraseology combine to denote an office more important than that, and its incorporation in the statute was such an extraordinary legislative procedure that we must attach a more than ordinary significance to it. When Congress said "that this Act shall be known and referred to as the 'White Slave Traffic Act,'" it meant, if it meant anything, that it should be understood and construed as an act for the suppression of the white slave trade. But we must understand the true import of those words before we can classify cases as within or without them. We cannot, of course, expect to find their definition in the older dictionaries, for the vicious practices which have introduced them into our language are of recent origin; but we do find, in a modern dictionary of accepted authority, definitions of a "white slave" and of "white slavery," in both of which the sale of young and innocent girls for immoral purposes is an essential element. Congress has not, however, used those words in a sense which restricts them to young girls; but it has used them in a sense which makes gain or restraint a necessary part of their definition, and that is made manifest by the report of the committee which prepared the bill and recommended its passage. This definition is authoritative, and controls the act.

Such is the view expressed by the Attorney General of the United States in an official communication to one of his subordinates; and by Mr. Justice Lamar in *United States* v. *Holte*, 236 U. S. 140, 146, in his dissenting opinion. We have a right to say that the meaning of the statute is, to say the least, so doubtful that this court ought to em-

ploy every known and approved method of ascertaining exactly what it means.

We are clearly within the rule which permits, and even requires, the court to take into consideration the results which must ensue, if that question be decided one way rather than the other. To hold that the act includes mere escapades transforms into a felony what all of the States have regarded as a misdemeanor for many years, and renders men infamous for conduct which, at its worst, might be no more than a transgression of the moral law. Our humanity revolts at the thought of punishing a moral lapse as a felony, and no law which does so can be properly enforced. The punishments provided in this statute when applied to cases of fornication or adultery may not be deemed cruel and unusual within the 8th Amendment, but they are so nearly such in fact as to engage the benevolence of judges, peace officers, and juries against its strict enforcement. It has long been a maxim with us that in order to insure the due enforcement of any statute its penalties must bear some fair relation to the offenses which it seeks to prevent, and we must assume that our federal lawmakers understood it.

We cannot suppose that those who drafted this law, or that those who enacted it upon a full consideration, could not foresee its consequences, and we must, therefore, suppose that the Congress of the United States knew that it was arming blackmailers, both male and female, with such an effective instrument as this act furnishes them, if construed to embrace mere escapades. It is a part of the history of our time that the Department of Justice is even now covering this Republic with a dragnet in an effort to apprehend those who have been preying upon the weaknesses and vices of men and women.

If the act must be construed to include cases of mere immorality, free from all element of commerce or coercion, then Congress had no constitutional power to enact it.

In each of the decisions which have heretofore sustained the constitutionality of the act, some element of commerce or coercion was involved. Much as we may abhor the idea that women are bought and sold, or transported from State to State for the purpose of hiring or exploiting them for immoral purposes, such a traffic is as much interstate commerce as the shipment of horses or cattle. In those cases the women were actually the subject of interstate commerce, and those who transported them were therefore within the regulatory power of Congress; but in this case the woman accompanied the man without any such purpose on his part, and she was not, therefore, the subject of interstate commerce. She was undoubtedly engaged in interstate commerce, and Congress could regulate her conduct so far as it related to or affected interstate commerce; but as she was not the subject of interstate commerce, Congress had no jurisdiction over any person simply because she traveled from California to Nevada. I do not forget that this court has said that persons may be the subject of interstate commerce, but that expression was used in declaring the power of Congress to regulate common carriers in the transportation of persons, or in declaring the power of Congress to regulate the conduct of persons engaged in interstate commerce; and in no case will it be found that this court has ever intimated that a person may, as to himself or herself, be the subject of interstate commerce. In the case of interstate travel the power of Congress is over the traveler, and not over any other person or thing; but in the case of an interstate shipment the power of Congress is over the subject-matter, as well as over the shipper. I think we may safely say that as every person passing from State to State has a right to go without molestation, insult, or injury, Congress could pass a law prohibiting affrays, or the use of obscene language, on any coach carrying interstate passengers; but beyond the safety and

comfort of interstate passengers Congress. cannot regulate the personal conduct of those who travel. The power is one over commerce, and is restrained by the very nature of it to commerce, in some substantial form.

How can a man violate an interstate commerce law when he does not travel himself, and does not send or receive anything from another State? It will not answer to say that he received the woman, because his interest in her was of that personal kind which is not reducible to commerce. The case would be entirely different if the woman whose transportation he had furnished was taken by him on the journey against her will or for the purpose of selling or exploiting her; for in that case she would be "the subject" of interstate commerce, and in transporting her from State to State he would be as much amenable to the commerce power of Congress as if he shipped a horse.

I will not insult the intelligence of the court by asking whether this law, if intended to apply to other than the real white slave traffic, is designed to regulate commerce or to regulate morals. If the law means that all immorality connected in any way with interstate transportation is within this act, then it is designed to regulate morals, not commerce; and if the Congress of the United States can, under the pretense of regulating commerce, take the morals of the people under federal control, it can, under the same pretense, gradually usurp the police powers of these States and finally destroy the States themselves.

*Mr. Harry O. Glasser* for petitioner in No. 464:

The word "prostitution" implies indiscriminate intercourse with men, *People* v. *Demousset*, 71 California, 611; *State* v. *Goodwin*, 33 Kansas, 538; *Carpenter* v. *People*, 8 Barbour (N. Y.), 603; *Van Dalsen* v. *Commonwealth*, 89 S. W. Rep. 255; *United States* v. *Smith*, 35 Fed. Rep. 490, and has been defined as involving the ideas of hire and

gain. *Munfill* v. *People*, 154 Illinois, 640; *State* v. *Gibson*, 111 Missouri, 97.

"Debauchery" signified originally an enticing away from employment or duty; later, a corruption of one's manners or morals, and as applied to women, merely seduction. *Koenig* v. *Nott*, 2 Hilt. (N. Y.) 323; Scott's Edition of Bailey's Dictionary (1755); McKenzie English Synonyms (London, 1854).

The words "other immoral practice" depend on the words preceding, embracing merely immoral acts which are analogous to prostitution and debauchery. As used in the statute, they apply to action which directly or indirectly involves gain. The true meaning is evidenced clearly by the definition of the act as the White Slave Traffic Act in § 8, which could have had no other purpose than to indicate the character of the offenses intended. All doubt on this subject is entirely removed by the report of the House Committee. Among other things the report makes very evident that the act was intended to combat an intolerable condition of affairs of recent origin due to modern transportation facilities. It could not, therefore, have been aimed at the practices of adultery and fornication.

Congress having no power to forbid these practices, the act must be construed within its power, that is, as relating to commerce or traffic in prostitutes. *United States* v. *Bitty*, 208 U. S. 393, related to an act passed to regulate the introduction of aliens into the country, which, as the court said, sought to keep out immigrants "whose permanent residence here would not be desirable, or for the common good." This was not necessarily based upon the commerce clause; the regulation of traffic and travel among citizens between different States is quite another thing, and so the intent of Congress in the alien act cannot be said to be the same as its intent in the White Slave Traffic Act, even though similar words are employed.

A definite evil was aimed at; not a general condition. *Holy Trinity Church* v. *United States*, 143 U. S. 457.

The conviction was not sustained by the indictment. The charges that the objects of the transactions complained of were prostitution and debauchery being in no respect made out, the conviction could only be sustained upon the charge that "other immoral practices" were in view. This allegation, merely following the generality of the statute, was insufficient. A conviction based on such a generality could not be pleaded against another indictment involving the same transaction.

The court should have warned the jury against the testimony of the woman as an accomplice, as requested by the petitioner.

That the woman transported is an accomplice, see *Holte* v. *United States*, 236 U. S. 140; *Reed* v. *State*, 63 Arkansas, 457; *People* v. *Collum*, 122 California, 186; *State* v. *Jones*, 115 Iowa, 113.

*Mr. Assistant Attorney General Wallace* for the United States.

MR. JUSTICE DAY delivered the opinion of the court.

These three cases were argued together, and may be disposed of in a single opinion. In each of the cases there was a conviction and sentence for violation of the so-called White Slave Traffic Act of June 25, 1910, 36 Stat. 825, the judgments were affirmed by the Circuit Courts of Appeals, and writs of certiorari bring the cases here.

In the Caminetti case, the petitioner was indicted in the United States District Court for the Northern District of California, upon the sixth day of May, 1913, for alleged violations of the act. The indictment was in four counts, the first of which charged him with transporting and causing to be transported and aiding and assisting in

obtaining transportation for a certain woman from Sacramento, California, to Reno, Nevada, in interstate commerce for the purpose of debauchery, and for an immoral purpose, to wit, that the aforesaid woman should be and become his mistress and concubine. A verdict of not guilty was returned as to the other three counts of this indictment. As to the first count defendant was found guilty and sentenced to imprisonment for eighteen months and to pay a fine of $1,500.00. Upon writ of error to the United States Circuit Court of Appeals for the Ninth Circuit, that judgment was affirmed. 220 Fed. Rep. 545.

Diggs was indicted at the same time as was Caminetti, upon six counts, with only four of which are we concerned, inasmuch as there was no verdict upon the last two. The first count charged the defendant with transporting and causing to be transported and aiding and assisting in obtaining transportation for a certain woman from Sacramento, California, to Reno, Nevada, for the purpose of debauchery, and for an immoral purpose, to wit, that the aforesaid woman should be and become his concubine and mistress. The second count charged him with a like offense as to another woman (the companion of Caminetti) in transportation, etc., from Sacramento to Reno that she might become the mistress and concubine of Caminetti. The third count charged him (Diggs) with procuring a ticket for the first mentioned woman from Sacramento to Reno in interstate commerce, with the intent that she should become his concubine and mistress. The fourth count made a like charge as to the girl companion of Caminetti. Upon trial and verdict of guilty on these four counts, he was sentenced to imprisonment for two years and to pay a fine of $2,000.00. As in the Caminetti case, that judgment was affirmed by the Circuit Court of Appeals. 220 Fed. Rep. 545.

In the Hays case, upon June 26th, 1914, an indictment

was returned in the United States District Court for the Western District of Oklahoma against Hays and another, charging violations of the act. The first count charged the said defendants with having, on March 17th, 1914, persuaded, induced, enticed and coerced a certain woman, unmarried and under the age of eighteen years, from Oklahoma City, Oklahoma, to the City of Wichita, Kansas, in interstate commerce and travel, for the purpose and with intent then and there to induce and coerce the said woman, and intending that she should be induced and coerced to engage in prostitution, debauchery and other immoral practices, and did then and there, in furtherance of such purposes, procure and furnish a railway ticket entitling her to passage over a line of railway, to wit, the Atchison, Topeka and Santa Fé Railway, and did then and there and thereby knowingly entice, and cause the said woman to go and to be carried and transported as a passenger in interstate commerce upon said line of railway. The second count charged that on the same date the defendants persuaded, induced, enticed and coerced the same woman to be transported from Oklahoma City to Wichita, Kansas, with the purpose and intent to induce and coerce her to engage in prostitution, debauchery and other immoral practices at and within the State of Kansas, and that they enticed her and caused her to go and be carried and transported as a passenger in interstate commerce from Oklahoma City, Oklahoma, to Wichita, Kansas, upon a line and route of a common carrier, to-wit, the Atchison, Topeka and Santa Fé Railway. Defendants were found guilty by a jury upon both counts, and Hays was sentenced to imprisonment for eighteen months. Upon writ of error to the Circuit Court of Appeals for the Eighth Circuit, judgment was affirmed. 231 Fed. Rep. 106.

It is contended that the act of Congress is intended to reach only "commercialized vice," or the traffic in women

for gain, and that the conduct for which the several petitioners were indicted and convicted, however reprehensible in morals, is not within the purview of the statute when properly construed in the light of its history and the purposes intended to be accomplished by its enactment. In none of the cases was it charged or proved that the transportation was for gain or for the purpose of furnishing women for prostitution for hire, and it is insisted that, such being the case, the acts charged and proved, upon which conviction was had, do not come within the statute.

It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms. *Lake County* v. *Rollins*, 130 U. S. 662, 670, 671; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1, 33; *United States* v. *Lexington Mill and Elevator Co.*, 232 U. S. 399, 409; *United States* v. *Bank*, 234 U. S. 245, 258.

Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. *Hamilton* v. *Rathbone*, 175 U. S. 414, 421. There is no ambiguity in the terms of this act. It is specifically made an offense to knowingly transport or cause to be transported, etc., in interstate commerce, any woman or girl for the purpose of prostitution or debauchery, or for "any other immoral purpose," or with the intent and purpose to induce any such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice.

Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to

them. To cause a woman or girl to be transported for the purposes of debauchery, and for an immoral purpose, to-wit, becoming a concubine or mistress, for which Caminetti and Diggs were convicted; or to transport an unmarried woman, under eighteen years of age, with the intent to induce her to engage in prostitution, debauchery and other immoral practices, for which Hays was convicted, would seem by the very statement of the facts to embrace transportation for purposes denounced by the act, and therefore fairly within its meaning.

While such immoral purpose would be more culpable in morals and attributed to baser motives if accompanied with the expectation of pecuniary gain, such considerations do not prevent the lesser offense against morals of furnishing transportation in order that a woman may be debauched, or become a mistress or a concubine from being the execution of purposes within the meaning of this law. To say the contrary would shock the common understanding of what constitutes an immoral purpose when those terms are applied, as here, to sexual relations.

In *United States* v. *Bitty*, 208 U. S. 393, it was held that the act of Congress against the importation of alien women and girls for the purpose of prostitution "and any other immoral purpose" included the importation of an alien woman to live in concubinage with the person importing her. In that case this court said:

"All will admit that full effect must be given to the intention of Congress as gathered from the words of the statute. There can be no doubt as to what class was aimed at by the clause forbidding the importation of alien women for purposes of 'prostitution.' It refers to women who for hire or without hire offer their bodies to indiscriminate intercourse with men. The lives and example of such persons are in hostility to 'the idea of the family, as consisting in and springing from the union for life of one

man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement.' *Murphy* v. *Ramsey*, 114 U. S. 15, 45. . . . Now the addition in the last statute of the words, 'or for any other immoral purpose,' after the word 'prostitution,' must have been made for some practical object. Those added words show beyond question that Congress had in view the protection of society against another class of alien women other than those who might be brought here merely for purposes of 'prostitution.' In forbidding the importation of alien women 'for any other immoral purpose,' Congress evidently thought that there were purposes in connection with the importations of alien women which, as in the case of importations for prostitution, were to be deemed immoral. It may be admitted that in accordance with the familiar rule of *ejusdem generis*, the immoral purpose referred to by the words 'any other immoral purpose,' must be one of the same general class or kind as the particular purpose of 'prostitution' specified in the same clause of the statute. 2 Lewis' Sutherland Stat. Const., § 423, and authorities cited. But that rule cannot avail the accused in this case; for, the immoral purpose charged in the indictment is of the same general class or kind as the one that controls in the importation of an alien woman for the purpose strictly of prostitution. The prostitute may, in the popular sense, be more degraded in character than the concubine, but the latter none the less must be held to lead an immoral life, if any regard whatever be had to the views that are almost universally held in this country as to the relations which may rightfully, from the standpoint of morality, exist between man and woman in the matter of sexual intercourse."

This definition of an immoral purpose was given prior to the enactment of the act now under consideration, and

must be presumed to have been known to Congress when it enacted the law here involved. (See the sections of the act [1] set forth in the margin.)

---

[1] Sections 2, 3, and 4 of the act are as follows:

"Sec. 2. That any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any Territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any Territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 3. That any person who shall knowingly persuade, induce, entice, or coerce, or cause to be persuaded, induced, enticed, or coerced, or aid or assist in persuading, inducing, enticing, or coercing any woman or girl to go from one place to another in interstate or foreign commerce, or in any Territory or the District of Columbia, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and who shall thereby knowingly cause or aid or assist in causing such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or any Territory or the District of Columbia, shall be deemed guilty of a felony and on conviction thereof shall be punished

But it is contended that though the words are so plain that they cannot be misapprehended when given their usual and ordinary interpretation, and although the sections in which they appear do not in terms limit the offense defined and punished to acts of "commercialized vice," or the furnishing or procuring of transportation of women for debauchery, prostitution or immoral practices for hire, such limited purpose is to be attributed to Congress and engrafted upon the act in view of the language of § 8 and the report which accompanied the law upon its introduction into and subsequent passage by the House of Representatives.

In this connection, it may be observed that while the title of an act cannot overcome the meaning of plain and unambiguous words used in its body, *United States v. Fisher*, 2 Cranch, 358, 386; *Goodlett v. Louisville and Nashville Railroad*, 122 U. S. 391, 408; *Patterson v. Bark Eudora*, 190 U. S. 169, 172; *Cornell v. Coyne*, 192 U. S. 418, 430; *Lapina v. Williams*, 232 U. S. 78, 92, the title of this act embraces the regulation of interstate commerce "by prohibiting the transportation therein for immoral purposes of women and girls, and for other purposes." It is true that

---

by a fine of not more than five thousand dollars, or by imprisonment for a term not exceeding five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 4. That any person who shall knowingly persuade, induce, entice, or coerce any woman or girl under the age of eighteen years, from any State or Territory or the District of Columbia, to any other State or Territory or the District of Columbia, with the purpose and intent to induce or coerce her, or that she shall be induced or coerced to engage in prostitution or debauchery, or any other immoral practice, and shall in furtherance of such purpose knowingly induce or cause her to go and to be carried or transported as a passenger in interstate commerce upon the line or route of any common carrier or carriers, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine of not more than ten thousand dollars, or by imprisonment for a term not exceeding ten years, or by both such fine and imprisonment, in the discretion of the court."

§ 8 of the act provides that it shall be known and referred to as the "White-slave traffic Act," and the report accompanying the introduction of the same into the House of Representatives set forth the fact that a material portion of the legislation suggested was to meet conditions which had arisen in the past few years, and that the legislation was needed to put a stop to a villainous interstate and international traffic in women and girls. Still, the name given to an act by way of designation or description, or the report which accompanies it, cannot change the plain import of its words. If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning.

Reports to Congress accompanying the introduction of proposed laws may aid the courts in reaching the true meaning of the legislature in cases of doubtful interpretation, *Blake* v. *National Banks*, 23 Wall. 307, 319; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1, 42; *Chesapeake and Potomac Telephone Co.* v. *Manning*, 186 U. S. 238, 246; *Binns* v. *United States*, 194 U. S. 486, 495. But, as we have already said, and it has been so often affirmed as to become a recognized rule, when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn from titles or designating names or reports accompanying their introduction, or from any extraneous source. In other words, the language being plain, and not leading to absurd or wholly impracticable consequences, it is the sole evidence of the ultimate legislative intent. See *Mackenzie* v. *Hare*, 239 U. S. 299, 308.

The fact, if it be so, that the act as it is written opens the door to blackmailing operations upon a large scale, is no reason why the courts should refuse to enforce it according to its terms, if within the constitutional authority of Congress. Such considerations are more appropriately

addressed to the legislative branch of the government, which alone had authority to enact and may if it sees fit amend the law. *Lake County* v. *Rollins, supra,* p. 673.

It is further insisted that a different construction of the act than is to be gathered from reading it is necessary in order to save it from constitutional objections, fatal to its validity. The act has its constitutional sanction in the power of Congress over interstate commerce. The broad character of that authority was declared once for all in the judgment pronounced by this court, speaking by Chief Justice Marshall, in *Gibbons* v. *Odgen,* 9 Wheat. 1, and has since been steadily adhered to and applied to a variety of new conditions as they have arisen.

It may be conceded, for the purpose of the argument, that Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey. But this act is not concerned with such instances. It seeks to reach and punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited.

The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.

Moreover, this act has been sustained against objections affecting its constitutionality of the character now urged. *Hoke* v. *United States,* 227 U. S. 308; *Athanasaw* v. *United States,* 227 U. S. 326; *Wilson* v. *United States,* 232 U. S. 563. In the *Hoke Case,* the constitutional objections were given consideration and denied upon grounds fully stated in the opinion (pp. 308 *et seq.*). It is true that the particular case arose from a prosecution of one charged with

transporting a woman for the purposes of prostitution in violation of the act. But, holding as we do, that the purposes and practices for which the transportation in these cases was procured are equally within the denunciation of the act, what was said in the *Hoke Case* as to the power of Congress over the subject is as applicable now as it was then.

After reviewing the *Lottery Case*, 188 U. S. 321, 357, and other cases in this court decided since the decision of that case, it was said in the *Hoke Case* (p. 323):

"The principle established by the cases is the simple one, when rid of confusing and distracting considerations, that Congress has power over transportation 'among the several States'; that the power is complete in itself, and that Congress, as an incident to it, may adopt not only means necessary but convenient to its exercise, and the means may have the quality of police regulations. *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 215; Cooley, Constitutional Limitations, 7th ed. 856. We have no hesitation, therefore, in pronouncing the act of June 25, 1910, a legal exercise of the power of Congress."

Notwithstanding this disposition of the questions concerning the construction and constitutionality of the act, certain of the questions made are of sufficient gravity to require further consideration.

In the Diggs case, after referring to the fact that the defendant had taken the stand in his own behalf and that his testimony differed somewhat from that of the girls who had testified in the case, and instructing the jury that it was their province to ascertain the truth of the matter, the court further said: "After testifying to the relations between himself and Caminetti and these girls down to the Sunday night on which the evidence of the Government tends to show the trip to Reno was taken, he stops short and has given none of the details or incidents of that trip nor any direct statement of the intent or purpose with

which that trip was taken, contenting himself with merely referring to it as having been taken, and by testifying to his state of mind for some days previous to the taking of that trip. Now this was the defendant's privilege, and, being a defendant, he could not be required to say more if he did not desire to do so; nor could he be cross-examined as to matters not covered by his direct testimony. But in passing upon the evidence in the case for the purpose of finding the facts you have a right to take this omission of the defendant into consideration. A defendant is not required under the law to take the witness-stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's silence; but where a defendant elects to go upon the witness-stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence; since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so."

This instruction, it is contended, was error in that it permitted the jury to draw inferences against the accused from failure to explain incriminating circumstances when it was within his power to do so, and thus operated to his prejudice and virtually made him a witness against himself in derogation of rights secured by the Fifth Amendment to the Federal Constitution.

There is a difference of opinion expressed in the cases upon this subject, the Circuit Court of Appeals in the Eighth Circuit holding a contrary view, as also did the

Circuit Court of Appeals in the First Circuit. See *Balliet* v. *United States*, 129 Fed. Rep. 689; *Myrick* v. *United States*, 219 Fed. Rep. 1. We think the better reasoning supports the view sustained in the Court of Appeals in this case, which is that where the accused takes the stand in his own behalf and voluntarily testifies for himself (Act of March 16, 1878, c. 37, 20 Stat. 30,) he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it.

The accused of all persons had it within his power to meet, by his own account of the facts, the incriminating testimony of the girls. When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to be for his interest and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him. The instruction to the jury concerning the failure of the accused to explain acts of an incriminating nature which the evidence for the prosecution tended to establish against him, and the inference to be drawn from his silence must be read in connection with the statement made in this part of the charge which clearly shows that the court was speaking with reference to the defendant's silence as to the trip to Reno with the girls named in the indictment, and as to the facts, circumstances and intent with which that trip was taken, and the jury was told that it had a right to take into consideration that omission.

The court did not put upon the defendant the burden

of explaining every inculpatory fact shown or claimed to
be established by the prosecution. The inference was to
be drawn from the failure of the accused to meet evidence
as to these matters within his own knowledge and as to
events in which he was an active participant and fully able
to speak when he voluntarily took the stand in his own
behalf. We agree with the Circuit Court of Appeals that
it was the privilege of the trial court to call the attention of
the jury in such manner as it did to this omission of the
accused when he took the stand in his own behalf.

See in this connection *Brown* v. *Walker,* 161 U. S. 591,
597; *Sawyer* v. *United States,* 202 U. S. 150, 165; *Powers* v.
*United States,* 223 U. S. 303, 314.

It is urged as a further ground of reversal of the judg-
ments below that the trial court did not instruct the jury
that the testimony of the two girls was that of accomplices,
and to be received with great caution and believed only
when corroborated by other testimony adduced in the
case. We agree with the Circuit Court of Appeals that
the requests in the form made should not have been given.
In *Holmgren* v. *United States,* 217 U. S. 509, this court
refused to reverse a judgment for failure to give an in-
struction of this general character, while saying that it was
the better practice for courts to caution juries against too
much reliance upon the testimony of accomplices and to
require corroborating testimony before giving credence to
such evidence. While this is so, there is no absolute rule of
law preventing convictions on the testimony of accom-
plices if juries believe them. 1 Bishop's Criminal Pro-
cedure, 2nd ed., § 1081, and cases cited in the note.

Much is said about the character of the testimony ad-
duced and as to certain facts tending to establish the
guilt or innocence of the accused. This court does not
weigh the evidence in a proceeding of this character, and
it is enough to say that there was substantial testimony
tending to support the verdicts rendered in the trial

courts.   Other objections are urged upon our attention, but we find in none of them a sufficient reason for reversing the judgments of the Circuit Courts of Appeals in these cases.

The judgment in each of the cases is

*Affirmed.*

Mr. Justice McReynolds took no part in the consideration or decision of these cases.

Mr. Justice McKenna, with whom concurred the Chief Justice and Mr. Justice Clarke, dissenting.

Undoubtedly in the investigation of the meaning of a statute we resort first to its words, and when clear they are decisive.   The principle has attractive and seemingly disposing simplicity, but that it is not easy of application or, at least, encounters other principles, many cases demonstrate.   The words of a statute may be uncertain in their signification or in their application.   If the words be ambiguous, the problem they present is to be resolved by their definition; the subject-matter and the lexicons become our guides.   But here, even, we are not exempt from putting ourselves in the place of the legislators.   If the words be clear in meaning but the objects to which they are addressed be uncertain, the problem then is to determine the uncertainty.   And for this a realization of conditions that provoked the statute must inform our judgment.   Let us apply these observations to the present case.

The transportation which is made unlawful is of a woman or girl "to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice."   Our present concern is with the words "any other immoral practice," which, it is asserted, have a special office.   The words are clear enough as general descriptions; they fail in particular designation; they are class words, not specifications.   Are they controlled by those which

CAMINETTI v. UNITED STATES.          497

242 U. S.    McKenna, J., White, C. J., and Clarke, J., dissenting.

precede them? If not, they are broader in generalization and include those that precede them, making them unnecessary and confusing. To what conclusion would this lead us? "Immoral" is a very comprehensive word. It means a dereliction of morals. In such sense it covers every form of vice, every form of conduct that is contrary to good order. It will hardly be contended that in this sweeping sense it is used in the statute. But if not used in such sense, to what is it limited and by what limited? If it be admitted that it is limited at all, that ends the imperative effect assigned to it in the opinion of the court. But not insisting quite on that, we ask again, By what is it limited? By its context, necessarily, and the purpose of the statute.

For the context I must refer to the statute; of the purpose of the statute Congress itself has given us illumination. It devotes a section to the declaration that the "Act shall be known and referred to as the 'White-slave traffic Act.'" And its prominence gives it prevalence in the construction of the statute. It cannot be pushed aside or subordinated by indefinite words in other sentences, limited even there by the context. It is a peremptory rule of construction that all parts of a statute must be taken into account in ascertaining its meaning, and it cannot be said that § 8 has no object. Even if it gives only a title to the act it has especial weight. *United States* v. *Union Pacific R. R. Co.*, 91 U. S. 72, 82. But it gives more than a title; it makes distinctive the purpose of the statute. The designation "White-slave traffic" has the sufficiency of an axiom. If apprehended, there is no uncertainty as to the conduct it describes. It is commercialized vice, immoralities having a mercenary purpose, and this is confirmed by other circumstances.

The author of the bill was Mr. Mann, and in reporting it from the House Committee on Interstate and Foreign Commerce he declared for the Committee that it was not

the purpose of the bill to interfere with or usurp in any way the police power of the States, and further that it was not the intention of the bill to regulate prostitution or the places where prostitution or immorality was practiced, which were said to be matters wholly within the power of the States and over which the federal government had no jurisdiction.. And further explaining the bill, it was said that the sections of the act had been "so drawn that they are limited to cases in which there is the act of transportation in interstate commerce of women for purposes of prostitution." And again:

"The White Slave Trade. A material portion of the legislation suggested and proposed is necessary to meet conditions which have arisen within the past few years. The legislation is needed to put a stop to a villainous interstate and international traffic in women and girls. The legislation is not needed or intended as an aid to the States in the exercise of their police powers in the suppression or regulation of immorality in general. It does not attempt to regulate the practice of voluntary prostitution, but aims solely to prevent panderers and procurers from compelling thousands of women and girls against their will and desire to enter and continue in a life of prostitution." House Report No. 47, 61st Cong., 2d sess., pp. 9, 10.

In other words, it is vice as a business at which the law is directed, using interstate commerce as a facility to procure or distribute its victims.

In 1912 the sense of the Department of Justice was taken of the act in a case where a woman of 24 years went from Illinois, where she lived, to Minnesota at the solicitation and expense of a man. She was there met by him and engaged with him in immoral practices like those for which petitioners were convicted. The district attorney forwarded her statement to the Attorney General, with the comment that the element of traffic was absent from the

transaction and that therefore, in his opinion, it was not "within the spirit and intent of the Mann Act."[1] Replying, the Attorney General expressed his concurrence in the view of his subordinate.[2]

Of course, neither the declarations of the report of the Committee on Interstate Commerce of the House nor the opinion of the Attorney General are conclusive of the meaning of the law, but they are highly persuasive. The opinion was by one skilled in the rules and methods employed in the interpretation or construction of laws, and informed besides of the conditions to which the act was addressed. The report was by the committee charged with the duty of investigating the necessity for the act and to inform the House of the results of that investigation, both of evil and remedy. The report of the committee has, therefore, a higher quality than debates on the floor of the House. The representations of the latter may indeed be ascribed to the exaggerations of advocacy or opposition. The report of a committee is the execution of a duty and has the sanction of duty. There is a presumption, therefore, that the measure it recommends has the purpose it declares and will accomplish it as declared.

---

[1] "Careful consideration of the facts and circumstances as related by Miss Cox fails to convince me that her case came within the spirit and intent of the Mann act. The element of traffic is entirely absent from this transaction. It is not a case of prostitution or debauchery and the general words 'or other immoral practice' should be qualified by the particular preceding words and be read in the light of the rule of Ejusdem Generis. This view of the statute is the more reasonable when considered in connection with Section 8 where Congress employs the terms 'slave' and 'traffic' as indicative of its purpose to suppress certain forms of abominable practice connected with the degradation of women for gain."

[2] "I agree with your conclusion that the facts and circumstances set forth in your letter and its enclosure do not bring the matter within the true intent of the White Slave Traffic Act, and that no prosecution against Edwards should be instituted in the federal courts unless other and different facts are presented to you."

This being the purpose, the words of the statute should be construed to execute it, and they may be so construed even if their literal meaning be otherwise. In *Holy Trinity Church* v. *United States*, 143 U. S. 457, there came to this court for construction an act of Congress which made it unlawful for any one in any of the United States "to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States . . . under contract or agreement . . . to perform labor or *service of any kind* [italics mine] in the United States, its Territories or the District of Columbia." The Trinity Church made a contract with one E. W. Warren, a resident of England, to remove to the City of New York and enter its service as rector and pastor. The church was proceeded against under the act and the Circuit Court held that it applied and rendered judgment accordingly. 36 Fed. Rep. 303.

It will be observed that the language of the statute is very comprehensive, fully as much so as the language of the act under review, having no limitation whatever from the context; and the Circuit Court, in submission to what the court considered its imperative quality, rendered judgment against the church. This court reversed the judgment, and, in an elaborate opinion by Mr. Justice Brewer, declared that "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." And the learned Justice further said: "This has been often asserted, and the reports are full of cases illustrating its application."

It is hardly necessary to say that the application of the rule does not depend upon the objects of the legislation, to be applied or not applied as it may exclude or include good things or bad things. Its principle is the simple one that the words of a statute will be extended or restricted to execute its purpose.

Another pertinent illustration of the rule is *Reiche* v. *Smythe*, 13 Wall. 162, in which the court declared that if at times it was its duty to regard the words of a statute, at times it was also its duty to disregard them, limit or extend them, in order to execute the purpose of the statute. And applying the principle, it decided that in a tariff act the provision that a duty should be imposed on horses, etc., and other *live animals* imported from foreign countries should not include canary birds, ignoring the classification of nature. And so again in *Silver* v. *Ladd*, 7 Wall. 219, where the benefit of the Oregon Donation Act was extended by making the words "single man" used in the statute mean an unmarried woman, disregarding a difference of genders clearly expressed in the law.

The rule that these cases illustrate is a valuable one and in varying degrees has daily practice. It not only rescues legislation from absurdity (so far the opinion of the court admits its application), but it often rescues it from invalidity, a useful result in our dual form of governments and conflicting jurisdictions. It is the dictate of common sense. Language, even when most masterfully used, may miss sufficiency and give room for dispute. Is it a wonder therefore, that when used in the haste of legislation, in view of conditions perhaps only partly seen or not seen at all, the consequences, it may be, beyond present foresight, it often becomes necessary to apply the rule? And it is a rule of prudence and highest sense. It rescues from crudities, excesses and deficiencies, making legislation adequate to its special purpose, rendering unnecessary repeated qualifications and leaving the simple and best exposition of a law the mischief it was intended to redress. Nor is this judicial legislation. It is seeking and enforcing the true sense of a law notwithstanding its imperfection or generality of expression.

There is much in the present case to tempt to a violation of the rule. Any measure that protects the purity of

women from assault or enticement to degradation finds an instant advocate in our best emotions; but the judicial function cannot yield to emotion—it must, with poise of mind, consider and decide.  It should not shut its eyes to the facts of the world and assume not to know what everybody else knows.  And everybody knows that there is a difference between the occasional immoralities of men and women and that systematized and mercenary immorality epitomized in the statute's graphic phrase "White-slave traffic."  And it was such immorality that was in the legislative mind and not the other.  The other is occasional, not habitual—inconspicuous—does not offensively obtrude upon public notice.  Interstate commerce is not its instrument as it is of the other, nor is prostitution its object or its end.  It may, indeed, in instances, find a convenience in crossing state lines, but this is its accident, not its aid.

There is danger in extending a statute beyond its purpose, even if justified by a strict adherence to its words.  The purpose is studied, all effects measured, not left at random—one evil practice prevented, opportunity given to another.  The present case warns against ascribing such improvidence to the statute under review.  Blackmailers of both sexes have arisen, using the terrors of the construction now sanctioned by this court as a help—indeed, the means—for their brigandage.  The result is grave and should give us pause.  It certainly will not be denied that legal authority justifies the rejection of a construction which leads to mischievous consequences, if the statute be susceptible of another construction.

*United States* v. *Bitty*, 208 U. S. 393, is not in opposition.  The statute passed upon was a prohibition against the importation of alien women or girls, a statute, therefore, of broader purpose than the one under review.  Besides, the statute finally passed upon was an amendment to a prior statute and the words construed were an addition to the

prior statute and necessarily, therefore, had an added effect. The first statute prohibited the importation of any alien woman or girl into the United States *"for the purposes of prostitution."* The second statute repeated the words and added *"or for any other immoral purpose"* (italics mine). Necessarily there was an enlargement of purpose, and besides the act was directed against the importation of foreign corruption and was construed accordingly. The case, therefore, does not contradict the rule; it is an example of it.

For these reasons I dissent from the opinion and judgment of the court, expressing no opinion of the other propositions in the cases.

I am authorized to say that the CHIEF JUSTICE and MR. JUSTICE CLARKE concur in this dissent.