In re GANTOS, INC., d/b/a Gantos, Gantos Boutique, Gantos Bargain Boutique, a Michigan corporation, Debtor.

In re GANTOS, STORES, INC., d/b/a Gantos Finance, Inc., a Michigan corporation, Debtor.

Bankruptcy Nos. SG 93–85478, SG 93–85479.

United States Bankruptcy Court, W.D. Michigan, Southern Division.

Jan. 17, 1995.

---

Jones, Day, Reavis & Pogue (Corey Lipoff, Sean D. Malloy, James M. Hall and Stephen E. Hall, briefed), Chicago, IL, and Dunn, Schouten & Snoap (Thomas W. Schouten and Perry G. Pastula, briefed), Grand Rapids, MI for debtors Gantos, Inc. and Gantos Stores, Inc.

Frost & Jacobs (Stuart B. Frankel and Ronald E. Gold, briefed), Cincinnati, OH, for Debartolo Properties Management, Inc. (Wash. Square landlords).

Smith, Haughey, Rice & Roegge (Dan C. Porter, briefed), Grand Rapids, MI, for Brookfield Development, Inc. (City Center landlords).

Peper, Martin, Jensen, Maichel & Hetlage (Michael A. Clithero, briefed), St. Louis, MO, for Northwest Plaza Associates, L.P.

Jenner & Block (David Neff, briefed), Chicago, IL, for Homart Development, Inc. (Tysons and Eden Prairie Malls).

## OPINION DETERMINING DAMAGE CAP PURSUANT TO 11 U.S.C. § 502(b)(6)(A)

JO ANN C. STEVENSON, Bankruptcy Judge.

Gantos, Inc. and Gantos Stores, Inc. (the "Debtors") own, operate, and manage specialty retail stores throughout the United States that offer women's apparel and accessories. Prior to bankruptcy, the Debtors operated 159 stores located primarily in suburban malls in the Midwest, Northeast, and West. Debtors initiated their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on November 12, 1993.[1] The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court. The Debtors are continuing in possession of their respective property and are operating and managing their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

This opinion addresses the lease rejection damage claims asserted by certain landlords. Specifically, the Court has been asked to determine the proper method for calculating the cap on the landlords' damages resulting from the Debtors' termination of real property leases pursuant to 11 U.S.C. § 502(b)(6)(A). Accordingly, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O) and the Court is authorized to enter a final order subject to those appeal rights provided by 28 U.S.C. § 158(a). Based on the following analysis, the Court concludes that the section 502(b)(6)(A) damage cap is a function of rent, not time.

Section 502(b)(6) provides:

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of

---

1. Unless otherwise noted, all future statutory references are to Title 11 of the United States Code as it was enacted by the Bankruptcy Reform Act of 1978 as amended. The Bankruptcy Reform Act of 1994 is inapplicable to the Court's resolution of this matter.

one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property ...

■ Congress intended that section 502(b)(6) compensate landlords for their loss while not allowing claims based on longterm leases to reach an amount that would preclude other general creditors from recovering a dividend from the estate. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–354 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 62–65 (1978). The Sixth Circuit has held that Congress intended this section to provide landlords with actual past damages and limited future damages. The goal of the statute is to compensate landlords while balancing the rights of other creditors and the debtor. *In re Vause*, 886 F.2d 794 (6th Cir.1989).

■ Section 502(b)(6) does not provide a formula for determining the total nonbankruptcy damages. However, after the landlord computes such a claim under applicable non-bankruptcy law, the claim is compared with, and limited by, the statutory maximum provided in section 502(b)(6)(A). *Goldblatt Bros., Inc.*, 66 B.R. 337, 345 (Bankr.N.D.Ill. 1986); *In re Communicall Cent., Inc.*, 106 B.R. 540 (Bankr.N.D.Ill.1989).

■ The dispute between the parties, namely, the Debtors and the Homart, City Center, Washington Square, and Northwest Plaza landlords ("the landlords"), concerns the proper method of calculating damages under the statute.[2] Debtors claim that the clause "or 15 percent" quantifies the total amount of time remaining in the term of the lease, while the landlords assert that "or 15 percent" quantifies the amount of rent reserved under the remainder of the lease. Although the parties on both sides of this dispute urge the Court to look at the "clear language" of § 502(b)(6)(A), *U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)), the Court found the statute anything but clear. However, after careful review of the parties' pleadings, legislative history, and applicable case law, the Court believes that the § 502(b)(6)(A) damage cap is a function of rent, not time.

In their Global Memorandum Of Law In Support Of The Debtors' Objections To Lease Rejection Damage Claims Asserted By Certain Landlords (the Global Memorandum) filed on December 15, 1994, the Debtors argue that calculating the cap using 15 percent of the aggregate rent under the lease and not the 15 percent of the time left under the term of the lease results in a different damage amount where the amount of rent reserved under the lease varies over its term. For example, under some leases, rent increases or decreases over the passage of time. Therefore, when the amount of rent due increases over the term of a given lease, 15% of the aggregate rent reserved under the lease will exceed the rent reserved for 15% of the remaining term of the lease.[3]

2. The Hunt Valley landlords also filed a response to the Debtors' objection to claim based on this issue on December 14, 1994. Because the dispute over the Hunt Valley landlord's claim was subsequently resolved, their argument regarding the § 502(b)(6) damage cap will not be addressed. Landlords other than those mentioned may have likewise raised the damage cap issue in briefs or other filed pleadings. As the docket for these consolidated Chapter 11 cases is over 250 pages in length, the Court did its best to mention those landlords which raised this issue, regardless of when, where, or how they did so. Gantos landlords who were either inadvertently excluded from mention, or failed to raise this issue, are bound by the holding of this opinion.

3. The Debtors proffered the following example. A chapter 11 debtor rejects a lease with 10 years remaining under the lease. Each of the first 5 years of the remaining lease term requires rental of $80,000 a year, and each of the last 5 years of the remaining lease term requires rental of $120,000 a year. If the § 502(b)(6)(A) damage cap is calculated as a function of time, 15% of the remaining lease term would be 1.5 years (10 years multiplied by .15), which would make the lessor's rejection damages $120,000 (1.5 years multiplied by $80,000 a year for that period of time). If the damage cap is calculated as a function of rent, the lessor would be entitled to $150,000 in damages ($1 million multiplied by 15%) (Debtors' Global Memorandum at pp. 7–8, n. 5).

Debtors contend that the landlords argue that § 502(b)(6) is a function of rent in order to obtain increased damage awards. The Court finds this argument unpersuasive for two reasons.

First, the landlords only seek damages for rent the parties bargained for when they entered into the lease. The Court finds it fair to base rejection damages on the total rent bargained for by the parties and fails to understand how landlords will unjustly benefit from doing so. Historically, the limitation on allowable claims of real property lessors was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Second, in a true lease of real property, the lessor retains all risks and benefits as to the value of the real estate at the termination of the lease. 124 Cong Rec H11094 (daily ed. Sept. 28, 1978). Therefore, since the landlords assume the risk that their lessors may file bankruptcy, they should not be stripped of any bargained for benefit in the terms of the leasing agreement.

Further, the Court does not believe that legislative intent will be frustrated by permitting landlords to recover damages based on the aggregate rent remaining under the lease. Allowing them to do so will more accurately compensate them for their loss while the 15% limitation on the rent recoverable will concomitantly ensure that other general creditors will have an opportunity to recover from the estate.

■ Second and more importantly, the Court believes that the statute allows for lease rejection damage claims with a damage cap based on rent *and* time, with the claim being limited to the rent unpaid on the date of bankruptcy plus the greater of one year's rent under the lease or *15% of the rent remaining under the lease*, but not to exceed three years rent. Norton Bankruptcy Law and Practice 2d, Sec. 41:24 (emphasis added). The 15% quantifies the aggregate rent remaining and not the time remaining under the lease. Although not a model of clarity, this appears to be the most natural interpretation of the statutory language. A majority of the case law supports this position. See *In re McLean Enterprises, Inc.*, 105 B.R. 928 (Bankr.W.D.Mo.1989); *In re Communicall Cent., Inc.*, 106 B.R. 540 (Bankr.N.D.Ill. 1989); *In re Q–Masters, Inc.*, 135 B.R. 157 (Bankr.S.D.Fla.1991); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229 (Bankr.D.N.D. 1992); *In re Financial News Network, Inc.*, 149 B.R. 348 (Bankr.S.D.N.Y.1993).

The Court notes that a fair amount of confusion exists as to how to interpret the § 502(b)(6) damage cap. This confusion is evident in the diametrically different applications of the 15% limitation. Compare *In re Allegheny Intern, Inc.*, 145 B.R. 823 (Bankr. W.D.Pa.1992) and *In re Iron–Oak Supply Corp.*, 169 B.R. 414 (Bankr.E.D.Ca.1994), which hold that "15% of the remaining term" be a measure of time, not rent with the cases cited *supra*. Some cases are even internally inconsistent on this issue. For example, both *Bob's Sea Ray Boats* and *Financial News Network, supra*, cite the holding of the *Allegheny* opinion favorably, yet still determine the damage cap by applying the 15% quantifier to the rent remaining under the lease. This inconsistency is undoubtedly due to the ambiguous wording of the statute as well as the fact that under most analyses, the outcome is the same under either interpretation because the rent is constant throughout the term of the lease.

Despite the conflicting case law, the Court believes that the natural reading of the statute, as well as congressional intent in its enactment, requires that we follow the majority of the case law and hold that the 15% quantifier is a function of rent, not time.