DEMOCRATIC SENATORIAL CAM-
PAIGN COMMITTEE, Appellant,

v.

FEDERAL ELECTION COMMISSION,

National Republican Senatorial
Committee, Intervenor.

No. 80–2074.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 23, 1980.

Decided Oct. 9, 1980.

Robert F. Bauer, Washington, D. C., with whom William E. McDaniels, John J. Buckley, and F. Whitten Peters, Washington, D. C., were on the brief, for appellant.

Kathleen Imig Perkins, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C., with whom Charles N. Steele, Gen. Counsel, Federal Election Commission, Washington, D. C., was on the brief, for appellee.

James F. Schoener, Washington, D. C., for intervenor.

Before WRIGHT, Chief Judge, and WILKEY and GINSBURG, Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by Circuit Judge WILKEY.

PER CURIAM:

This case calls for construction of the Federal Election Campaign Act of 1971 (FECA) and its 1974 and 1976 Amendments, 2 U.S.C. § 431 et seq.[1] Under a provision of the Act that permits the State committees of the political parties to make expenditures on behalf of senatorial candidates,[2] a num-

1. The Federal Election Campaign Act (FECA) of 1971, Pub.L.No.92–225, 86 Stat. 3, was amended by the FECA Amendments of 1974, Pub.L.No.93–443, 88 Stat. 1263, by the FECA Amendments of 1976, Pub.L.No.94–283, 90 Stat. 475, and by the FECA Amendments of 1979, Pub.L.No.96–187, 93 Stat. 1339. The rel-

evant provisions of the Act are hereinafter cited to the United States Code only; section references are all to Title 2.

2. 2 U.S.C. § 441a(d)(3). The section also authorizes expenditures on behalf of House candidates.

ber of Republican State committees have executed agreements by which they purport to designate the National Republican Senatorial Committee (NRSC) as their agent for purposes of making expenditures up to the legal limits. The Democratic Senatorial Campaign Committee (DSCC) has challenged this practice as contrary to the letter and purpose of the applicable statutory provisions. The DSCC first sought relief by filing a complaint with the Federal Election Commission (FEC), which upheld the legality of the "agency" agreements.[3] Assuming that it must sustain Commission decisions not shown to be arbitrary and capricious, the District Court granted the FEC's motion for summary judgment.[4] Because we believe that both the FEC and the District Court misconstrued the applicable law, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Agency Agreements*

The Federal Election Campaign Act, as amended, imposes limitations on campaign contributions and expenditures by individuals and by various kinds of political committees. Section 441a(d)(3), the provision centrally at issue in this case, provides for campaign spending by State and national committees of the political parties:

> (3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate * * * which exceeds—
>
>   *   *   *   *   *   *

> (i) 2 cents multiplied by the voting age population of the State * * *.

Although phrased in restrictive terms, Section 441a(d)(3) is in fact a grant of permission: It permits the national and State committees to make expenditures that would otherwise be prohibited.[5]

As it has done in each campaign since 1976, the Republican National Committee has designated the NRSC as its agent, authorized to make the expenditures permitted to the national committee by Section 441a(d) in all senatorial elections.

Various State committees of the Republican Party have also designated the NRSC as their agent under Section 441a(d). As in the case of the national committee, their agency agreements purport to transfer to the NRSC spending authority conferred under Section 441a(d)(3).[6] In the 1978 senatorial elections, during which the State committees commissioned the NRSC as their agent for the first time, the NRSC spent a total of $2,770,995 under the combined spending authority of the national and State party committees.[7] Most of the money went into 12 closely contested races, in which the NRSC spent $2,180,499. Of this sum, $1,106,286.60 was attributable to its expenditures as agent for the national committee, the remaining $1,074,213.40 to expenditures as agent of various State committees.

Agency agreements related to 1980 contests purport to authorize the NRSC to spend even larger sums. There are Senate races in 34 States, whose 34 Republican State committees have a composite spending ceiling of $3,487,020.80 under Section

---

3. The Commission decision in this case, which it designated as Matter Under Review (MUR) 1234, issued on July 10, 1980.

4. The decision of the District Court, rendered August 28, 1980, is printed in the Joint Appendix (JA) at 157.

5. *See* brief for appellee at 10 n.5 ("Absent § 441a(d), party committees could make no expenditures whatsoever in connection with the Congressional campaigns of their party's candidates.").

6. A sample "agency" agreement, pursuant to which the Alabama Republican Executive Committee designated the National Republican Senatorial Committee (NRSC) as its agent for making the senatorial campaign expenditures authorized by § 441a(d)(3), appears as Appendix B to the brief for intervenor NRSC.

7. JA 105.

441a(d)(3).[8] A number of these State committees have designated the NRSC as their authorized spending agent. In California alone, the NRSC will be able to spend up to $485,024 as the agent of the State committee, and a total of $970,048 in its capacity as dual agent of the State and national committees. In New York the comparable figures are $379,717.12 and $759,434.24.

### B. *Proceedings Before the Federal Election Commission*

On May 9 of this year the Democratic Senatorial Campaign Committee filed a complaint with the Federal Election Commission in which it challenged the legality of the agency agreements entered by the NRSC and the various Republican State committees.[9] In its accompanying memorandum of law,[10] the DSCC argued that the challenged arrangements violate the plain meaning of Section 441a(d)(3), which provides separate spending limits for State and national party committees and makes no reference to agency. The DSCC claimed that a clear purpose of the statutory scheme was to create an incentive to the development of vigorous State party organizations. The DSCC did not challenge the agency agreement between the NRSC and the Republican National Committee, since the FEC at that time interpreted a Commission regulation, 11 C.F.R. § 110.7, to authorize such agreements.[11] Moreover, the DSCC

itself has made an agency agreement with the Democratic National Committee.

The Commission dismissed the complaint. Although it gave no reasoned explanation of its decision, the FEC acted after receipt of a report from its General Counsel.[12] The "First General Counsel's Report" stated that this was the third time that a complaint of this kind had come before the Commission. Although it recommended the same result that the FEC had reached in the prior cases,[13] the report suggested that the General Counsel's emphasis shifted over the course of the various proceedings.[14] In the first proceeding the General Counsel had attributed importance to the absence of any express statutory prohibition of agency arrangements. In this case, however, the General Counsel placed greater reliance on an inference of congressional intent apparently drawn from a related section of the Federal Election Campaign Act, Section 441a(a)(4). That provision allows for unlimited transfers of money between and among political committees of the same party, as defined by the statute.[15] Assuming that the NRSC was a committee of the Republican Party within the meaning of Section 441a(a)(4), the General Counsel reasoned that, because the NRSC could lawfully transfer money to the State committees, which the State committees could then spend up to a limit of 2 cents per resident of voting age, the statute must have intend-

---

8. JA 106.

9. The complaint is reprinted at JA 1–9.

10. Reprinted at JA 19–28.

11. In fact, the regulation authorizes agency agreements only in presidential campaigns. The FEC has since conceded its interpretive error. *See infra.*

12. First General Counsel's Report, July 8, 1980, reprinted at JA 46–57.

13. The FEC had decided the prior cases, designated MUR 780 and MUR 820, in response to complaints about NRSC spending pursuant to "agency" agreements during the 1978 campaigns. The decision in MUR 780 came in response to a complaint by the National Committee for an Effective Congress concerning expenditures during the Montana senatorial

campaign of Larry Williams; the FEC apparently acted *sua sponte* in initiating the MUR 820 inquiry into the financing of the senatorial campaign of James Martin of Alabama. The Commission did not come to a decision on either MUR 780 or MUR 820 until after the election. *See also infra.*

14. First General Counsel's Report, *supra* note 12, at 4–5, JA 49–50.

15. Section 441a(a)(4) provides in pertinent part:

The limitations on contributions contained in paragraphs (1) and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party. * * *

ed that the NRSC could itself make expenditures up to that limit while acting as the agent of the State committees.[16] The General Counsel also cited the more general argument that the provision permitting expenditures by the State and national party committees was intended to be "broad"—broad enough to permit the pooling of large numbers of small contributions made to the political parties and their various committees. After receiving the General Counsel's report on July 8, the Commission rendered its judgment on July 10.[17] By a vote of 6–0 it found "no reason to believe" that the NRSC's agency agreements with the State committees violated Section 441a(d)(3). The FEC's summary announcement of the decision did not explicitly adopt the report of the General Counsel.[18]

### C. *Proceedings Before the District Court*

The DSCC sought District Court review of the FEC's action.[19] Its petition, filed July 30, 1980, requested a declaratory judgment that the FEC's decision was "contrary to law," on the theory that Section 441a(d)(3) precludes the State committees from assigning their spending limits to the NRSC. Ruling on cross-motions for summary judgment, the District Court decided in favor of the FEC on August 28. The court held that the FEC must prevail unless its action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."[20] Judge June Green found no violation of that standard. The District Court construed the decision of the FEC as resting on the inference, advanced by the General Counsel, that the transfer of funds provision of Section 441a(a)(4), when read in conjunction with Section 441a(d)(3),

revealed a congressional willingness to treat the funds and expenditures of various party committees, including the NRSC, as essentially interchangeable.[21] The DSCC docketed an appeal in this court on September 4, 1980. The NRSC moved to intervene. on September 19, and the court agreed to the intervention.

## II. STANDARD OF REVIEW

The District Court regarded the decision of the FEC as entitled to extreme deference. We approach the matter differently.

Although a court should undertake only "a very limited review of the exercise of the FEC's discretionary decisions," *In re Carter-Mondale Reelection Committee, Inc.*, 642 F.2d 538, 545 (D.C.Cir.1980), we deal in this case, not with a discretionary exercise of Commission power, but with an interpretation of a federal statute. The Supreme Court has long recognized that "the courts are the final authorities on issues of statutory construction" and need not "rubberstamp" administrative decisions that misinterpret a federal statute. *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978) (*quoting Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968), and *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

█ We recognize that special deference to an agency's interpretation of its governing statute is often appropriate. *Cf. Gelman v. FEC*, 631 F.2d 939, 943 (D.C.Cir., 1980). But the Supreme Court has established that an agency's entitlement to deference depends upon the quality of its determinations.[22] Factors to be considered

---

**16.** *See* First General Counsel's Report, *supra* note 12, at 5, JA 50 (quoting MUR 820) and 8, JA 53.

**17.** JA 58.

**18.** *See id.* The failure to incorporate the First General Counsel's Report was in accord with usual FEC procedure. *See infra.*

**19.** Jurisdiction for review in the District Court is provided by 2 U.S.C. § 437g(a)(8). The Dis-

trict Court summarily denied a motion to intervene filed by the NRSC.

**20.** *Democratic Senatorial Campaign Committee v. FEC*, D.D.C. Civil Action No. 80–1903, Aug. 28, 1980, memorandum opinion at 3, JA 159.

**21.** *Id.*

**22.** *Compare Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971), *with Espinoza v. Farah*

include " 'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.' " *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978) (*quoting Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). Measured against this standard, the Commission's performance in the matter before us fails to merit the court's substantial deference.

First, the Commission has presented no reasoned explanation of its decision. It merely pronounced that it found "no reason to believe" that the NRSC violated the Act in making expenditures as agent of the national and State committees.[23] We are not even certain whether the Commission endorsed the reasoning of its General Counsel, since the Commission's decision did not explicitly adopt the General Counsel's report and the Commission's own newsletter, the *FEC Record*, has avowed that Commission actions "are not necessarily based on, or in agreement with, the General Counsel's analysis." [24]

Second, even if we were to accept the analysis of the General Counsel as that of the Commission, we would still encounter a troubling absence of consistent reasoning. On two prior occasions, the first January 19, 1979 and the second June 17, 1979, the FEC upheld the legality of NRSC-State committee agency agreements. In those cases, as in the case at bar, the FEC file apparently included a General Counsel's report recommending approval of the challenged agree-

ments.[25] From report to report, Counsel's grounds for his recommendation shifted perceptibly.

In the first case, the General Counsel rested on the absence from the text of Section 441a(d)(3) of an explicit prohibition of agency agreements and on a reading of Section 441a(a)(4) that would permit unlimited transfers of funds from NRSC to the State committees. *See* First General Counsel's Report, *supra*, at 4, JA 49.

In the second proceeding he added a new justification, arguing that a recently promulgated regulation, 11 C.F.R. § 110.7, permitted the national committee of a political party to designate any agent for the purpose of making Section 441a(d)(3) expenditures. Because the goal of that regulation was to promote coordination among party committees, the Counsel reasoned that the State committees should also be permitted to designate spending agents under Section 441a(d)(3). *See* First General Counsel's Report, *supra*, at 5, JA 50.

The present litigation has evidenced three more changes in the position of either the General Counsel or the Commission. First, and most important, the Commission brief in this court disavowed the heavy reliance that the General Counsel once placed on a provision of 11 C.F.R. § 110.7. *See* brief for appellee at 9–12. Because the section relied upon, Section 110.7(a)(4), authorizes agents only in connection with presidential campaigns, not congressional contests, the FEC has now conceded that prior citations to the section to sustain the designation of agents in Senate races seriously misconstrued the

---

Manufacturing Co., 414 U.S. 86, 92–96, 94 S.Ct. 334, 338–340, 38 L.Ed.2d 287 (1973), *and General Electric Co. v. Gilbert*, 429 U.S. 125, 140–143, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343 (1976).

**23.** This bare pronouncement reflects consistent Commission practice. After concluding a case the FEC places the relevant documents, including staff reports and recommendations, in a public file. The Commission does not endorse the reasoning of its staff, nor does it offer reasons of its own. *See* Note, *The Federal Election Commission: The First Amendment and Due Process*, 89 Yale L.J. 1199, 1211–1212 (1980).

Failure to adhere to accepted standards of reasoned decisionmaking not only undermines public confidence but may actually impair the substantive quality of the Commission's performance. *See id.* at 1211. It also deprives a reviewing court of any Commission record on which to base a deferential consideration.

**24.** *FEC Record*, Oct. 1979, at 4.

**25.** The FEC has not supplied copies of those reports. The First General Counsel's Report in the present case, however, refers back to the earlier reports.

regulation. Nonetheless, the misconstruction appeared in the First General Counsel's Report made public at the time of the Commission's decision in this case.

In a second significant change, the General Counsel retreated from any substantial reliance on the absence of an express agency prohibition in the text of Section 441a(d)(3). First General Counsel's Report, *supra*, at 4, JA 49. Third, and finally, the General Counsel's report presented a new argument to justify the legality of agency agreements. Once again relying primarily on Section 441a(a)(4), the Counsel appended the corollary claim that congressional failure to amend that section to prohibit transfers of funds by the NRSC constitutes implicit ratification of the Commission's position. *Id.* at 8–11, JA 53–56.

These alterations in grounds for the agency's decision do not warrant our rejection of any individual argument proffered by the General Counsel or the Commission. We are prepared to consider each, in its turn. But the Counsel's shifting positions offer no adequate support for a claim that the Commission's position here is a product of thorough consideration, careful deliberation, and secure judgment. We must decide for ourselves whether the action of the Commission was "contrary to law."[26]

26. The dissent makes two distinct points concerning the respect the Commission's decision should command. First, the Commission is entitled to deference in construing its own statute. *See* dissenting op. at 782. Second, the court should refrain from upsetting an arrangement supported by "precedent established over the lifetime of the practice." *Id.* at 786. The dissent does not weight, indeed it does not mention, the failure of the FEC to provide a consistent, reasoned explanation of the position it has taken. Moreover, the dissent's reliance on "established" precedent hangs by a slender thread. Commission decisions relevant to this case are of recent vintage. Judge Wilkey recites Commission precedent in four numbered paragraphs. *See* dissenting op. at 786–787. Only one of the recitations is squarely in point. The first three paragraphs relate to Commission expressions on delegations by the *national* rather than the State committees. The fourth paragraph invokes the FEC decisions in MURs 780 and 820, the only precedents directly on target. But neither of these matters was decided until 1979. Prior to the District Court opinion in this case, *no* judicial precedent existed.

## III. EXPENDITURE LIMITATIONS UNDER SECTION 441a(d)(3)

■ The agency agreements executed by the Republican State committees and the NRSC purport to transfer spending authority conferred by Section 441a(d)(3). Our inquiry into the permissibility of such agreements begins with examination of the statute itself.[27] Accepted principles of construction establish the presumption that the terms of statutes are ordinarily intended to carry their plain meaning. *See SEC v. Sloan, supra; Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *March v. United States,* 506 F.2d 1306 (D.C.Cir.1974).

The relevant language of Section 441a(d)(3) authorizes "the national committee of a political party, or a State committee of a political party, including any subordinate State committee," to make "any expenditure" of up to 2 cents per voting-age resident on behalf of the party's senatorial candidate. The operative terms are plain and precise. There is no suggestion that Congress chose its language loosely. Section 441a(d)(3) not only designates spending limits with mathematical rigor; it also confers authority to reach those limits on two named committees, both clearly identified

When Congress expressly provides litigants with a right of judicial review, it is not open to the court to shirk its responsibility by invoking an intervenor's reliance on a short course of unreviewed agency actions.

27. Intervenor NRSC appears to believe that we are not entitled to reach this question, being bound instead to hold for the FEC under principles of *res judicata* and collateral estoppel which NRSC contends forbid our hearing the case. *See* brief for intervenor at 10. We are of the view that claim and issue preclusion principles are inapplicable to the present case. Where, as here, the statute provides for judicial review, an agency's decision on a question of law does not control the judgment of an Article III court. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 131, comments a and d, at 32–33, 39 (Tent. Draft No. 7 1980) ("[An] agency determination is no more res judicata in [a judicial] review proceeding than is a trial court judgment res judicata in an appellate court in which it is under appeal.").

by statutory definitions. Section 431(14) defines the "national committee" as "the organization which, by virtue of the by-laws of a political party, is responsible for the day-to-day operation of such political party at the national level." Section 431(15) defines a "State committee" as "the organization which, by virtue of the by-laws of a political party, is responsible for the day-to-day operation of such political party at the State level."

It is obvious that the NRSC is neither the "national" nor a "State" committee of the Republican Party within the contemplation of Section 441a(d)(3). Nor do we understand either the FEC or the NRSC to contend that the NRSC qualifies as a "subordinate committee of a State committee," the third kind of committee to which Section 441a(d)(3) refers. Nor, finally, does the statute make reference to any other kind of permissible arrangement by which the State party organizations might convey their spending authority to any other organization. The plain language of the statute thus seems to preclude any arrangement by which the special authority of a named entity is transferred to another.[28]

In its brief as an intervenor in this court, NRSC urges the contrary inference. In so doing, it rehearses an argument invoked by the Commission's General Counsel in an earlier case, the same one on which the General Counsel no longer places substantial reliance. *See* First General Counsel's Report, *supra,* at 4, JA 49. According to the NRSC, this court should infer that agency

agreements are permissible under Section 441a(d)(3) because the statutory text includes no express prohibition of agency relationships. The NRSC's argument depends for its plausibility on its use of "agency" terminology. The language of Section 441a(d)(3) presumably does not prohibit a State political committee's employment of an agent in the standard legal sense; the failure of the statute to mention agency does not, for example, mean that the State committees may not hire staff authorized to act in their behalf. Against this background of familiar usage, however, it is somewhat misleading to characterize the challenged relationships between the State committees and the NRSC as ones of "agency." The State committees do not, in the role of principal, raise and transfer funds to the NRSC as agent; nor do they give any direction as to how "their" funds ought to be spent. Rather, the NRSC raises and spends money as it sees fit; the State committees interact with the NRSC only in the initial agreement to the arrangement. Thereafter the State committees serve as legal shells. We cannot believe that Congress intended the language of Section 441a(d)(3) to authorize artificial relationships of this kind.

We are buttressed in our reliance on the clear language of Section 441a(d)(3) both by the provision's statutory context and by legislative history. The NRSC and its parallel congressional campaign committees were familiar to the Congress that adopted

---

**28.** The dissent, like intervenor NRSC but unlike the FEC, argues that First Amendment rights of speech and association would be violated if § 441a(d)(3) were construed to deny the capacity of State committees to assign their statutory authority to the NRSC. Reliance for this argument is placed on *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). That decision held unconstitutional limitations on independent expenditures by individuals and nonparty associations in election campaigns. The Court addressed and upheld expense ceilings on national and State party committees only in the context of the Fifth Amendment challenge there made. 424 U.S. at 58–59 nn.66, 67, 96 S.Ct. at 653, 654 nn.66, 67. But as the FEC notes, brief for appellee at 10 n.5, independent expenditures are not at issue here: "Party com-

mittees * * * are deemed incapable of making independent expenditures in connection with the campaigns of their party's candidates." *Cf.* 2 U.S.C. § 441a(a)(7)(B)(i) (any expenditure made "in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate.").

Nor do we understand NRSC to suggest in this case that it has made independent expenditures on behalf of candidates, expenditures of the kind the *Buckley* Court found to be constitutionally protected. And surely no frontal attack has been made by NRSC on the constitutionality *vel non* of expenditure limitations imposed on party organs.

Section 441a(d)(3). Indeed, Congress specifically provided for such committees in Section 441a(h), which permits "the Republican or Democratic Senatorial Campaign Committee, or the national committee of a political party, or any combination of such committees" to make direct contributions of up to $17,500 to senatorial candidates, "notwithstanding any other provision of this Act."[29] If Congress had similarly intended for the NRSC to share in the spending permissions of Section 441a(d)(3), it is not unreasonable to think that Congress would have said so explicitly, or at least signalled its intention in the course of its deliberations.

Yet the legislative history gives no hint that Congress ever foresaw, much less intended, that delegations of spending authority under Section 441a(d)(3) might be attempted. On the contrary, during the 1974 legislative debates Senator Brock noted with concern that the Act and its proposed Amendments failed to provide more permissive treatment to the congressional campaign committees.[30] Though he was fully aware of the proposed Section 441a(d)(3) permission for expenditures by the national and State committees—and in fact mentioned it during his remarks—Senator Brock proposed a further amendment that would have exempted congressional campaign committees like the NRSC from the Act's expenditure limits. "I offer this

amendment," he said, "because I do not believe that as the bill is written [the congressional campaign committees] could literally operate in support of our candidates under the existing language."[31]

The Senate initially adopted the amendment offered by Senator Brock, but reversed itself five days later.[32] The record of the Senate debate leading to repeal of the Brock amendment is equally revealing. With the attention of the Senate again riveted on the status of the congressional campaign committees under the Federal Election Campaign Act, not a single Senator ever suggested that the NRSC or any similar committee might be able to assume the spending authority of the State committees. Moreover, the 1974 debates evidence a congressional distinction between the political parties, whose role in the political process Congress sought to strengthen, and the campaign committees of the House and Senate. Senator Clark, who led the fight to repeal the Brock amendment, spoke to this point explicitly. "No one," he said, "should confuse national political parties, supported as they are by thousands of people giving in $5 and $10 amounts, with the Senate and House Campaign Committees."[33]

Thus, no more in the legislative history than in the language of Section 441a(d)(3) do we find support for the kind of transfer of statutory authority at issue in this case.[34]

---

**29.** Appellant Democratic Senatorial Campaign Committee argues that the language of § 441a(h) by its own force prohibits any "agency" agreements that lead to NRSC expenditures of more than $17,500 in any single Senate race. *See* brief for appellant at 18–20. In its view, § 441a(h) exhibits clear congressional intent to limit NRSC expenditures to this amount. Because we rest our holding on the plain language of § 441a(d)(3) itself, we need not decide whether § 441a(h) implies a limitation on § 441a(d)(3) or any other provision of the Act.

**30.** 120 Cong.Rec. S5189–S5191 (daily ed. Apr. 3, 1974).

**31.** *Id.* at S5189.

**32.** *Id.* at S5411–S5415 (daily ed. Apr. 8, 1974).

**33.** *Id.* at S5411.

**34.** Appellee purports to find evidence of congressional support for its construction of § 441a(d)(3) in the failure of Congress to enact legislation that would have prohibited explicitly any "movement of funds" between State political committees and congressional campaign committees such as the NRSC. *See* brief for appellee at 14–15. The evidence is entirely unpersuasive. First, post-enactment legislative history has very limited utility in statutory construction, *see SEC v. Sloan*, 436 U.S. 103, 120–122, 98 S.Ct. 1702, 1712–1713, 56 L.Ed.2d 148 (1978), and in no case could it change the intent of the Congress that passed the statute. *See Regional Rail Reorganization Cases*, 419 U.S. 102, 152, 95 S.Ct. 335, 363, 42 L.Ed.2d 320 (1974). Second, the House never actually rejected the bill on which appellee relies, but instead refused to consider the measure on its merits. *See* 124 Cong.Rec. H2261–H2269 (daily ed. Mar. 21, 1978). Third, even within the bill the transfer provision was relatively minor;

## IV. RELEVANCE OF THE TRANSFER PROVISION

The FEC argues that since Section 441a(a)(4) permits the NRSC to transfer unlimited funds to the State committees, it would be "placing form over substance" to forbid the State committees to designate NRSC as their agent. Brief for appellee at 17. We do not address the question whether NRSC may freely transfer funds to State committees under Section 441a(a)(4), because that issue was not joined before this court. While not conceding the validity of such transfers,[35] DSCC does not now challenge transfers of funds from NRSC to the State committees, apparently because no such transfers have ever been made.

We are not convinced, however, that an outright transfer of funds from NRSC to a State committee would be equivalent to an "agency" relationship in which the agent, NRSC, controls the funds from start to finish—from raising to spending. In the latter situation the State committee may have no voice in the way funds are spent. Nor is this a difference that is obviously without consequence. When the NRSC pays the piper, it will call the tune. The candidate may have little incentive to communicate with the State committee, preferring to deal with a committee of his colleagues that directs the flow of funds.

If funds were actually transferred to the State committees, on the other hand, the committees would be more likely to maintain an active role throughout the campaign. Even if NRSC attempted to direct how transferred funds were to be spent, the State committees would actually make the day-to-day campaign expenditures and might be able to persuade NRSC that funds should be spent differently than the congressional committee envisioned. As State committees assumed responsibility for campaign disbursements, moreover, candidates might confer more closely with those committees and remain more closely in touch with their local party constituents. Since the structure of the Act suggests that Congress intended to increase the role of State and national committees, not of congressional committees, we find these possible differences to be potentially meaningful.[36]

It would be inappropriate for this court to speculate further about the ways in which transfers of funds might differ from agency agreements. The parties have not

---

it is at best unclear that the vote to deny legislative consideration on the merits was motivated by opposition to any particular section. Fourth, the House debate and vote occurred before any FEC decision upholding the legality of agency agreements between State committees and the NRSC under § 441a(d)(3). Fifth, and most important, the proposed ban on the transfer of funds, even had it been adopted, would not speak directly to the issue in this case. Our question involves the legality of an arrangement by which a State committee purports to assign its statutory spending rights to the NRSC, not the legality of a fund transfer.

**35.** We have some doubt about whether § 441a(a)(4) encompasses the congressional committees at all. In order to fall within that section the congressional committees would have to be either "national * * * committees * * * of [a] political party" or subordinate to such a committee. Section 431(14) defines "national committee" in a manner that the parties agree excludes congressional committees. We do not know whether the congressional committees could establish that they are subordinate to the national committees of their parties.

**36.** The dissent argues that the same number of dollars will be raised by the NRSC and spent in the same State senatorial campaigns, regardless of whether the NRSC is permitted to act as the agent of the State committees, dissenting op. at 785–786, and that this factor is all that matters in terms of "substance." The dissent thus fails to consider the possible importance of State committee *control* of finances in strengthening the influence of the State committees and encouraging candidates to communicate more closely with their State party constituencies. Nor is the dissent even consistent in its claim that the court's decision exalts form over substance. Having argued at length that our opinion will not alter the "substance" of campaign finance, the dissent then proceeds to claim that the result will be more sweeping than even the plaintiffs had "bargained for." *Id.* at 785. The court, the dissent argues, should not upset a method of campaign financing that the NRSC has found to have "some functional advantage." *Id.* at 786. Yet the location of such a "functional advantage" in a senatorial campaign committee, rather than in the national or State committees, is a result that Congress showed no desire to achieve.

argued the validity of funds transfers, but only of agency agreements. Since we find that the plain language of Section 441a(d)(3) precludes the latter,[37] we must reverse the District Court, declare the Commission's failure to act contrary to law, and direct the Commission to conform with this decision forthwith. *See* 2 U.S.C. § 437g(a)(8)(C).

*So ordered.*

## WILKEY, Circuit Judge, dissenting:

Like Chief Judge Wright and Judge Ginsburg, I too have read the statute and base my opinion as to the necessary result in this case on its plain language. Unlike my colleagues, however, I do not approach the task of this court as if we are the first called upon to construe this statute; the issue before us is not our construction of the statute *de novo*, but whether the Commission's interpretation of the statute can be supported on a rational basis so that its conclusion cannot be said to be "contrary to law." [1] Also unlike my colleagues, I reach a result supported by the General Counsel of the Federal Election Commission, the unanimous 6 to 0 vote of the Members of the Commission, and the decision of the District Judge below.[2]

## I. STRAIGHT STATUTORY CONSTRUCTION

We start with 2 U.S.C., Ch. 14—Federal Election Campaigns[3], § 441a, *Limitations on Contributions and Expenditures.* There are *two* subsections—not just one—relevant and decisive in this case.

   a. *Dollar limits on contributions.*

\*   \*   \*   \*   \*   \*

**37.** Like the Commission, the dissent fails to come to grips with the only real issue in this case: may party organizations effectively rewrite § 441a(d)(3) of the Act to displace State committees and substitute congressional campaign committees in their stead? For the reasons stated in our opinion, the clear answer to this question is "no."

**1.** 2 U.S.C. § 437g(a)(8)(C) (1976) and subsequent amendments.

The statutory standard for judicial review requires the court to overturn a Commission interpretation of its implementing statute which is "contrary to law." *Id.* § 437g(a)(8)(C). The Federal Election Campaign Act delegates to the Commission especially broad discretion to set election law policy and to draw the meaningful distinctions appropriate to definitions under the election law. *E. g.*, 2 U.S.C. § 437c(b)(1), *as amended by* Pub.L. No.96–187, § 306(b)(1), 93 Stat. 1355 (1979): "The Commission shall administer, seek to obtain compliance with, and *formulate policy* with respect to, this Act," (emphasis added); 2 U.S.C. § 431(14)—(15): "The[se] term[s] ... mean[ ] ..., *as determined by the Commission* " (emphasis added).

**2.** *Democratic Senatorial Campaign Committee v. FEC,* No. 80–1903 (D.D.C. 28 Aug. 1980).

The penchant of this court to give no deference whatsoever to the responsible agency's interpretation of its role and basic statute has been noted with acerbity by the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) and by commentators, *e. g.,* Scalia, *"Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court,"* 1978 S.Ct.Rev. 345,

358, 371. Deference to the Commission on new issues like this before a new agency gives the agency the chance it needs to make its own interpretation, because it has the responsibility to make its statute work. *Power Reactor v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). Deference to the Commission's view on election law policy and what constitutes compliance seems particularly advised in that events occur very quickly in an election year. The Commission is the expert body charged by Congress with the coherent administration of elections and must, therefore, be competent to reach expeditious and equitable judgments drawing reason out of a melange of vaguely consistent election laws obviously adopted by the process of political compromise on this highly charged political field; it is the Commission which is prepared to read the body of election law as a whole. Moreover, the Commission is self-consciously bipartisan. Congress created a Commission, 2 U.S.C. § 437c (1976), which could make sensitive political decisions cognizant of bipartisan exigencies. Courts should tread lightly on these matters of party politics.

**3.** The Federal Election Campaign Act of 1971 (FECA), Pub.L.No.92–225, 86 Stat. 3, was amended by the Federal Election Campaign Act Amendments of 1974, Pub.L.No.93–443, 88 Stat. 1263, by the Federal Election Campaign Act Amendments of 1976, Pub.L.No.94–283, 90 Stat. 475, by the Social Security Amendments of 1977, Title V, Sec. 502, Pub.L.No.95–216, 91 Stat. 1565, and by the Federal Election Campaign Act Amendments of 1979, Pub.L.No.96–187, 93 Stat. 1339.

(4) The limitations on contributions contained in paragraphs (1) and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party.

\*　　\*　　\*　　\*　　\*　　\*

(d) *Expenditures by national committee, State committee, or subordinate committee of State committee in connection with general election campaign of candidates for Federal office.*

\*　　\*　　\*　　\*　　\*　　\*

(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State Committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

(A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

(ii) $20,000; and

(B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner of any other State, $10,000.

The latter of the two above provisions, (d)(3), fulfills one of the two prime objectives of the Federal Election Campaign Act—to place a limit on overall expenditures in campaigns for federal office. For my colleagues this provision is sufficient

unto itself to settle the question before us in this case. For me it is not sufficient, because this section alone does not purport to tell us where the money, whose total amount is limited, is coming from.[4] To find out that we must look back at the first part of § 441a, *Limitations on Contributions and Expenditures*, to the very first subsection: (a) *Dollar limits on contributions*. Subsections (1), (2), and (3) deal with limits on contributions by persons, multi-candidate political committees, and individuals, provisions which are directed to the second principal objective of the FECA, *i. e.*, eliminating undue and corrupting political influence on candidates and officeholders by limiting contributions. The subsections dealing with persons, multi-candidate political committees, and individuals are not relevant to this case, but subsection (a)(4), quoted above, certainly is.

Subsection (a)(4), far from placing any limitation, specifically provides that the prior limitations in (1) and (2) (persons and multi-candidate political committees) "do not apply to transfers between and among political committees which are national. State, district, or local committees (including any subordinate committee thereof) of the same political party." As will be discussed more fully under IV below, while there are evils associated with large contributions by persons and multi-candidate political committees to candidates for federal office, there are no visible evils associated with the transfer of funds among committees of the same political parties. The contribution limitations as to the original sources have already been applied, and the connection between the recipient federal candidate and the original source of the funds is totally broken and obscured.[5]

So, looking again at subsection (d)(3), we might expect that the national committee

**4.** The majority, maj. op. at 778–779, appears to be singularly concerned with *who* may spend money under FECA rather than from *where* campaign money may lawfully flow. The transfer provision, 2 U.S.C. § 441a(a)(4), indicates strong legislative intent that campaign monies flow freely through a political party's extended network. Plainly, Congress

thought to permit the discretionary assignment of funds among a party's component organizations.

**5.** *See* notes 7–18, 25 *infra* & accompanying text. *See also Common Cause v. Schmitt*, 512 F.Supp. 489 at 499 & n. 40 (D.D.C.1980) (three-judge court).

of each political party, or a state committee of a political party, would gain a substantial amount of contributions from persons generally, and would employ those funds most efficiently to assist the candidates for Senator or Representative in each State as its judgment indicated—but within the overall limit on expenditures as provided by subsection (d)(3). However, in addition to the contributions of persons or other authorized entities, which are limited by §§ 441a(a)(1), (2), and (3), these party national and state committees have an additional source of funds, and that is a transfer of funds from one of the "political committees which are national, State, district, or local committees . . . of the same political party" under subsection (a)(4). These transfers are plainly unlimited in amount, because the funds have been accumulated in obedience to the contribution limits of § 441a(a) and there is no visible evil in the transfer of funds among political committees of the same party, if both the individual contribution limits and the overall expenditure limits on any campaign race are observed.

The Senatorial Campaign Committees and the Congressional Campaign Committees of each major political party have proved to be highly successful fund-raisers. The plaintiff Democratic Senatorial Campaign Committee does not challenge in this suit that under § 441a(a)(4) either a Senatorial Campaign Committee or a Congressional Campaign Committee of either party *can transfer* an unlimited amount of money to either that party's national committee or that party's state committee in one of the individual states, and that the money so transferred can be expended on behalf of that party's candidate for either the Senate or the House in a given state—all within the expenditure limit of (d)(3).

However, for reasons which are not obvious in the record and which are immaterial, the Senatorial and Congressional Campaign Committees of *both* political parties have found it administratively advantageous to

make the above-described transfer of funds in an indirect way.[6] Instead of the Senatorial or Congressional Campaign Committee writing its check to the order of the national committee of its party, the Senatorial or Congressional Campaign Committee of both parties has followed the practice of having the national committee *authorize* the Senatorial or Congressional Campaign Committee of its party to make expenditures *as its agent* on behalf of designated candidates for the Senate and the House. Again, such expenditures by a given national committee from all sources must be within the overall limits of subsection (d)(3).

Significantly, and interestingly, this indirect device of appointing the Senatorial or Congressional Campaign Committee as the agent of the *national* committee, a practice followed by both political parties, is *not* challenged by the plaintiff Democratic Senatorial Campaign Committee here. What is challenged is the exact parallel in direct transfer of funds by the authorization of a *state* committee to the Senatorial (or Congressional) Campaign Committee to expend funds on behalf of a designated candidate for the Senate or House of that political party.[7] This delegation of expenditure authority is practiced *only* by the *Republican* Senatorial and Congressional Campaign Committees, but *not* by the *Democratic.* Why this is so we do not know, and it is immaterial to any court decision, because the delegation of authority from the state committee to the Senatorial or Congressional Campaign Committees rests on precisely the same rationale and statutory provisions permitting unlimited transfers as does the delegation of authority from the national committee to the Senatorial or Congressional Campaign Committees, a practice engaged in by *both* political parties.

## II.   FORM OVER SUBSTANCE

My colleagues say that we are not called upon here to pass upon a transfer case, that

6. Counsel for appellant, Democratic Senatorial Campaign Committee, has informed the court that it too is the designated agent of its party's national committee.

7. *Cf.* Maj. op. at 781–782.

there is actually no writing of a check by the National Republican Senatorial Committee to a state committee on behalf of a Senatorial candidate in that state. This is true. The transfer of funds and the transfer of their political effect do not take place in that way; it is done indirectly as described above by the delegation of authority from the state committee to the Senatorial Committee (or from the national committee, unchallenged here).

The difference is purely one of form, not substance. It makes absolutely no difference in the scheme of control of campaign expenditures and contributions whether the National Republican Senatorial Committee in Washington writes a check and mails it to the state committee in Louisville, Kentucky, to be expended for the benefit of the Republican nominee for the Senate in the State of Kentucky, or, on the other hand, as is now the practice, the state committee in Louisville, Kentucky, writes a letter to the Senatorial Campaign Committee in Washington authorizing that committee to make expenditures on behalf of the same Republican nominee for the Senate in Kentucky. In either event, the funds expended come from the contributions accumulated by the Senatorial Committee in Washington, those contributions having been duly made in accordance with the limitations of § 441a(a), and expended within the overall limitations of § 441a(d)(3).

It is precisely because to accede to the view argued for by the plaintiff here and espoused by my colleagues would do nothing but exalt form over substance that the Federal Election Commission very sensibly responded in a requested opinion that such delegation of authorized expenditures to the Senatorial or Congressional Campaign Committee of the same party was lawful within the meaning and purpose of the statute. The FEC stated: "Since funds may be transferred between the congressional cam-

paign and the national committee of the same political party without limitation, it is immaterial as to which committee's funds are being expended under 2 U.S.C. § 441a(d)(3)." [8] There is simply no sense in prohibiting the letter of authorization being written in Louisville and mailed to Washington, when it is recognized that the statute plainly permits under § 441a(a)(4) a check to be written in Washington and mailed to Louisville to accomplish precisely the same purpose, i. e., spending money accumulated by the National Republican Senatorial Committee on behalf of the Republican candidate for Senator in the State of Kentucky.[9]

According to the majority's view, two things will happen: First, the letters of authorization from the state committees to the National Republican Senatorial Committee will become of no effect and the Senatorial Committee in Washington will immediately start writing checks to each state committee for the amount which it has decided to allocate in support of the Republican Senatorial candidates in those states. Secondly—and this is more than the plaintiffs have asked or bargained for— *both the National Committees of the Republican and Democratic parties* will immediately be required to stop writing letters of authorization to their respective Senatorial and Congressional Campaign Committees in Washington; instead, the National Committees of both parties will simply have to arrange the direct transfer of funds from their respective Senatorial and Congressional Campaign Committees, as authorized by § 441a(a)(4), and then the National Committees (instead of the Senatorial or Congressional Campaign Committees) will expend those funds within the limits of subsection (d)(3) on behalf of selected candidates for the Senate and House in the states.

The net result of plaintiff Democratic Committee's position prevailing is that not

---

**8.** Advisory Opinion, AO 1976–108, *reprinted in* Commission Appendix at 3a, *reprinted in* [1980] Fed.Elec.Camp.Fin. Guide (CCH) ¶ 5236.

**9.** There is no question in this case of limitations on *contributions* under 2 U.S.C. § 441a(h) ($17,-

500 contribution limit imposed on national and Senatorial Campaign Committees). This case involves only the spending of money in campaigns and applicable *expenditure* limits.

one dollar less will be spent, not one dollar will be changed from where the members of the national committee, or state committee in consultation with the Senatorial or Congressional Campaign Committees of their respective parties, want the dollar to be expended. All that will happen is that the money will be transferred and administered in a manner which *neither* major political party has found most efficient, but which the Federal Election Commission has held is the exact practical equivalent of the practice of authorized delegation now being followed by both political parties.

An obvious question arises: If the respective committees can transfer and spend the money in precise technical compliance with both relevant subsections of the statute, why do not the committees use this form and achieve the same substance? The record is bare of any explanation of why the various committees have followed the current practice, which dates at least from 1976. Both major parties use the method of their respective National Committees authorizing the Senatorial and Congressional Campaign Committees as agents to make expenditures for candidates within the statutory limits. Only the Republicans have seen fit to have their state committees so work with the National Campaign Committees. There may be advantages of economy of scale in expenditures from one source, of available expertise in creating and placing advertisements, in obtaining media exposure, in obtaining credit during the campaign, etc.; the court can only speculate. All we know is that both parties employ the indirect method of expenditure by authorizing the committees in Washington as agents, that it must have some functional advantage, and that the Democratic Senatorial Campaign Committee (which does not act as an agent for Democratic *state* committees) has taken the trouble to challenge the National Republican Senatorial Com-

mittee's actions as agent for Republican state committees.

## III. ESTABLISHED PRECEDENT—ACTION AND OPINION

While the advantage of what the intervenor Republican Committee is doing is not obvious from the record, the profound—and grossly unfair—disadvantage of the court sustaining this Democratic Committee challenge at this late hour is undeniably clear. The actions challenged were in accord with the precedent established over the lifetime of the practice of delegation by both the national and state committees, which rest on the same rationale.

(1) In 1976 the Republican National Committee (RNC) designated the National Republican Senatorial Committee (NRSC) as its agent to make the expenditures for congressional campaigns permitted under subsection (a)(4) and (d)(3).[10] The Democratic National Committee filed a complaint challenging this indirect method, but withdrew it.[11]

(2) Representative Cleveland requested an advisory opinion on the practice, which was specifically approved in Advisory Opinion 1976–108, cited above.[12]

(3) At this time the FEC was engaged in rulemaking, and produced § 110.7 *Party Committee Expenditure Limitations* (2 U.S.C. § 441a(d)). Regulation § 110.7(a)(4) specifically approves the *national* committee of a party making any authorized expenditure under § 441a(d) "through any designated agent" in connection with a presidential campaign. No reference was made to a *state* committee acting through an agent, although both national and state committees are authorized to make expenditures by § 441a(d); the explanation offered is that at that time in 1976 no state commit-

**10.** *See* Brief for Appellee at 3; Appellant's Brief at 20 n.16; Brief in Behalf of Intervenor, Republican National Senatorial Committee at 3-4.

**11.** *See* Brief in Behalf of Intervenor, Republican National Senatorial Committee at 4.

**12.** *Reprinted in* Brief for Appellee, Commission Appendix at 3a; [1980] Fed.Elec.Camp.Fin. Guide (CCH) ¶ 5236.

tee had made any agency designation in either a presidential or a congressional campaign. Furthermore, it was only in 1978, after the regulation was promulgated, that agency designations were made by state committees to the Congressional Committees in campaigns for House and Senate races.[13]

(4) In 1978 several Republican state committees followed the practice begun in 1976 by the RNC and designated the intervenor National Republican Senatorial (or Congressional) Committee as an agent to make expenditures for the benefit of congressional candidates. This was challenged in two complaints. In MUR 780 [14] the FEC concluded on 19 January 1979 that the NRSC had not violated 2 U.S.C. § 441a(d) by making § 441a(d) expenditures as agent of *both* the Montana Republican *State* Committee and the Republican *National* Committee. Likewise, in MUR 820 the FEC concluded on 19 June 1979 that there was no violation of § 441a(d) by the NRSC acting as agent of both the RNC and the Alabama Republican Party.[15] The plaintiff here, the Democratic Senatorial Campaign Committee, did not protest or attempt to overturn these FEC rulings until May 1980 with the filing of this complaint before the FEC.

Surely this was amply reassuring precedent for the intervenor NRSC to continue in this campaign year the practice of acting as agent of the RNC and state committees to make expenditures under §§ 441a(a)(4) and (d)(3), a practice which had been validated and sustained by the FEC against

every challenge since 1976. In reliance thereon the intervenor NRSC has entered into contracts for campaign activities, with the media and political suppliers, and with employees to serve during the campaign. These are substantial commitments of millions of dollars, which this court now throws into jeopardy and confusion 30 days before the campaign is to end, in spite of four years of precedential rulings contra by the responsible agency, the FEC, confirmed in this specific case by the FEC General Counsel's opinion, the unanimous 6 to 0 vote of the FEC members, and the decision of the District Court.

One minor point perhaps should be noted at this time. While counsel for the Democratic Senatorial Campaign Committee responded in answer to a direct question from the court at oral argument that the plaintiff was "not challenging transfers in this case," yet it has been suggested that neither the Democratic Senatorial Campaign Committee nor the National Republican Senatorial Committee (nor their respective Congressional Campaign Committees) are "national" committees within the meaning of § 441a(a)(4) authorizing unlimited "transfers between and among committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party." We can assume for the disposition of this case, since no party challenges it, that the Senatorial Campaign Committees are within the scope of the "transfer" provision.[16]

---

13. *See* Brief in Behalf of Intervenor, Republican National Senatorial Committee at 4.

14. *See* Commission files, Matter Under Review, MUR 780 (19 Jan. 1979).

15. *See* Commission files, MUR 820 (19 June 1979).

16. The broad, inclusive scope of the transfer provision, 2 U.S.C. § 441a(a)(4), the compelling need for Commission discretion, and the congressional contemplation of joint "national committee"/"Senatorial Campaign Committee" activity obvious in 2 U.S.C. § 441a(h), all suggest that any committee of a political party, including a party's Senatorial Campaign Committee, would be free to initiate and receive funds transfers under § 441a(a)(4). The Sena-

torial and Congressional Campaign Committees are identifiable as, and are in fact, part of either the Republican or Democratic parties. *See* 119 Cong.Rec. S5194 (daily ed. 3 Apr. 1974) (remarks of Sen. Baker). Furthermore,

[t]he conferees also determined that it is appropriate to set a higher limit on contributions from persons to political committees of national political parties in order to allow the political parties to fulfill their unique role in the political process. In this connection, the term "political committee established or maintained by a national political party" includes the Senate and House Campaign Committees.

H.R.Rep.No.94–1057 (Conf.Rep.), 94th Cong.2d Sess. 58 (1976) (discussion of 2 U.S.C. §§ 441a(a)(1)(B)–(2)(B)).

## IV. TWO PRINCIPAL PURPOSES OF THE FEDERAL ELECTION CAMPAIGN LAWS

It is undisputed that two of the principal objectives of reform in the conduct of federal elections were, first, putting some kind of an overall limit on the horrendously escalating cost of political campaigns, and, secondly, eliminating the pernicious influence of the large campaign contributor over the political candidate or political officeholder.[17] These two reform objectives were to be accomplished in three ways: first, overall limits on campaign expenditures in the races for President, the Senate, and the House; secondly, stringent limitations on the individual contributions which could be made by persons and organized entities to individual candidates and special purpose committees; [18] thirdly, a system of full public disclosure of all expenditures and all except the most minor contributions.

When we look at the plain language of the statutory scheme, we see that there are overall limits on the expenditures in campaigns for the Senate and the House under § 441a(d)(3). There is no suggestion whatsoever in the plaintiff's argument or in my colleagues' opinion that the practice challenged here in any way is an attempt to or could evade the overall expenditure limitations of subsection (d)(3). It is perfectly clear that whatever funds of the intervenor NRSC, acting as agent of either the Republican National Committee or a state party committee, are expended on behalf of any given Senatorial candidate, those expenditures must be within the overall limits authorized to the RNC or to the state committee, respectively. This is true whether the Senatorial Committee makes the expenditure itself as a result of being designated as an agent of the state or national committee and authorized thereby to make the expenditure, or whether the Senatorial Committee writes a check to either the national committee or the state committee.

Furthermore, accountability for all funds expended on behalf of a given political candidate by any party political committee is placed in the state's party central committee. Regulation § 110.7,[19] *Party committee expenditure limitations (2 U.S.C. 441a(d))* specifically provides under subsection (c)(1): "The State central committee shall be responsible for insuring that the expenditures of the entire party organization are within the limitations, including receiving reports from any subordinate committee making expenditures under paragraph (b) of this section, and filing consolidated reports showing all expenditures in the State with the Commission." The "expenditures under paragraph (b) of this section" refers to the expenditures of "the general election campaign of a candidate for federal office in that state who is affiliated with the party," *i. e.*, a designated Republican or Democratic candidate for the Senate or for the House.

The second principal purpose of campaign reform, limiting contributions in order to eliminate the evil effect of huge contributions influencing candidates or officeholders, is taken care of in § 441a(a), *Dollar limits on contributions.*[20] As was briefly discussed above, after placing specific limits on (1) persons, (2) multi-candidate political committees, and (3) individual aggregate contributions, the Congress came to consider the possible and probable "contributions" to be anticipated between political committees of the same political party. These, of course, are not "contributions" in the original sense;[21] they are actually

17. *See Buckley v. Valeo*, 424 U.S. 1, 25–26, 96 S.Ct. 612, 637–638, 46 L.Ed.2d 659 (1976) (per curiam).

18. Controlling campaign contributions, the Supreme Court held in *Buckley v. Valeo*, legitimately suppressed corruption and venal influence by eliminating the possibility of *quid pro quos.*

19. 11 C.F.R. § 110.7 (1977).

20. *See* notes 17–18 *supra* & accompanying text.

21. Party committees, including Senatorial and Congressional Campaign Committees, it is worth noting, are deemed incapable of making *independent expenditures* which were accorded great protection in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *Common Cause v. Schmitt*, 512 F.Supp. 489 (D.D.C.1980) (three-judge court). *See* Brief for Appellee at 10 n.5. 2 U.S.C. § 441a(d) is the

*transfers* of funds which have been received by the respective committees within the contribution limit for individuals and organizations previously set. Hence, the Congress made absolutely clear in § 441a(a)(4) that the limitations on contributions in the above paragraph "do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party."

The reason for this Congressional exemption of transfers between political committees of the same party is perfectly obvious: there is no evil to be prevented by barring the free exchange of funds among political committees of the same party. There is no fear of undue influence exerted by a large contributor over the individual candidate or political officeholder, for two reasons: (1) the individual contributions have originally been limited by the contribution limits in the statute; and (2) the political candidate or officeholder does not know who made the contributions to the overall national, state, district, or local committee which generously endows him with funds, or, at least, he does not know who contributed the specific dollars which the individual candidate receives.[22] And, no matter by whom or by whose agency the expenditures are made, the expenditures on any candidate's behalf must be within the limits of § 441a(d)(3). Since there was no evil to be prevented by imposing a restriction on transfers, Congress very wisely specifically said that there were no limits on transfers; and, the Federal Election Commission, charged with implementing and enforcing the campaign laws, has very wisely and sensibly said, from the start and consistently thereafter, that the practice of designating another committee as an agent and authorizing expenditures of funds by the agent, when the funds could have been directly transferred anyway, is the equivalent of the transfers specifically authorized by the statute.

Not only is there no evil to be prevented by the limitation which the plaintiff Democratic Committee has persuaded my colleagues to write into the statute, but there are positive benefits to be gained by allowing the free interchange of funds among political committees of the same party, whether by direct transfers or indirectly by authorizing another committee to act as agent in making the expenditures. A party cannot "unduly influence" its own candidate, but by supplying funds for the individual candidate it may instill in the candidate some sense of party loyalty and party responsibility, which is generally recognized to be a beneficial relationship. Certainly to the extent an individual candidate is beholden to his own political party for a substantial portion of his campaign funds, he is much less vulnerable to individual pressure groups who would sway his vote, for good or evil, on certain critical issues.[23]

It should not be overlooked that the funds raised by the committees referred to in subsection (a)(4), whose funds are to be freely transferred, are funds raised from citizens all over the United States. To that extent they are an amalgamation, an expression of support from small contributors. In that respect they are similar to the funds raised through the federal tax process by the check-off on individual income tax returns, which is an expression of national policy preferring funds to be raised as anonymously and in as widespread a fashion as possible. To the extent that these funds can be used freely in individual Senate and House campaigns, we are implementing a definite national policy. The

---

only statutory authorization for *expenditures* by party political committees. There is no support for an inference that Senatorial and Congressional Campaign Committees were meant by Congress to be excluded from making *any expenditures* at all in connection with campaigns. It makes more sense that these Campaign Committees should share in their parties' overall expenditure limitations.

22. *See generally Common Cause v. Schmitt,* 512 F.Supp. 489 (D.D.C.1980) (three-judge court).

23. As a Congressman, Judge Abner Mikva, presently a member of this court, argued for the benefits of free transferability of party funds. 124 Cong.Rec. H2263 (daily ed. 21 March 1978).

position urged by the plaintiff here and adopted by Judges Wright and Ginsburg cuts directly contrary to that salutary policy by eliminating the most effective and efficient method chosen.

## V. FIRST AMENDMENT CONSIDERATIONS

It is quite apparent from the lengthy Congressional debates in regard to the federal election laws over a period of years that Congress was quite aware of the fact that, in imposing contribution and expenditure limitations, it was legislating in an area of vital First Amendment concerns. If there was any legislator who was not aware of that, he was surely made aware of it by the Supreme Court's decision in *Buckley v. Valeo.* "The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." [24]

There is no need to rehash the extensive Supreme Court analysis on the First Amendment grounds in *Buckley.* It is clear that the Court held that construction of the Act must be made in light of First Amendment rights, and so must this court's construction here. It is sufficient to point out that the Supreme Court sustained limitations on individual contributions only because the perceived evil of undue influence by large contributors on candidates and officeholders was sufficient to justify these restrictions. At the same time, the Supreme Court struck down the limitations on individual expenditures on behalf of his own individual candidacy, because the use of money by an individual is a form of speech protected by the First Amendment, and there could be no evil of undue influence by one man exercising his First Amendment rights.

Similarly, in the case at bar, there is no visible evil in any "undue influence" by a political party on its own nominated candidate for the Senate or the House. [25] Hence, there is absolutely no evil to be eliminated by gratuitously imposing a restriction on the free interchange of funds among the political committees of the same political party, so long as those funds are accounted for and the expenditures are controlled by a designated accountable committee within the overall limitations on expenditures for that office. It is illuminating to compare the specific restrictions, which Congress did clearly write into the statute, with the tortuous and convoluted construction which my colleagues find it necessary to engage in to sustain the prohibition against free interchange of funds argued for the plaintiff Democratic Committee. [26] When there is no clear, specific prohibition against the action complained of, the difficulty of finding the rationale to restrict free speech should be proof positive that my colleagues are engaged in an unworthy effort.

Mark this well. No person, no group of persons (committee) needs the *permission* of any Congress or any court to spend money to assist candidates for public office. That is free speech. There can be limitations and regulations as to amounts, methods,

---

**24.** 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976).

**25.** *Cf. Common Cause v. Schmitt,* 512 F.Supp. 489 (D.D.C.1980) (three-judge court) at Part III. A. 4. (political committees, through expenditures rather than contributions, do not pose *quid pro quo* threat).

**26.** The First Amendment protects political association as well as political expression. The constitutional right of association explicated in *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), stemmed from the Court's recognition that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group asso-

ciation." Subsequent decisions have made clear that the First and Fourteenth Amendments guarantee "freedom to associate with others for the common advancement of political beliefs and ideas," a freedom that encompasses " '[t]he right to associate with the political party of one's choice.' " *Kusper v. Pontikes,* 414 U.S. 51, 56, 67, 94 S.Ct. 303, 307, 312, 38 L.Ed.2d 260 (1973), quoted in *Cousins v. Wigoda,* 419 U.S. 477, 487, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975).

*Buckley v. Valeo,* 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (emphasis added). *See also Common Cause v. Schmitt,* 512 F.Supp. 489 (D.D.C.1980) (three-judge court) at Part III B.

publicity, and accountability, but the validity of those limitations will be strictly tested. The limitation must be justified by the evil which the limitation is designed to prevent, just as we test any other limitation on free speech. In this, as in any other area of free speech, the limitation must be precisely spelled out and clearly relevant to prevention of evil.[27] Neither the plaintiff nor my colleagues have even claimed any evil to be prevented by the restriction they would engraft on the statute. Section 441a(d)(3) is no prohibition on the activities of intervenor National Republican Senatorial Committee, but an overall limit on expenditures for federal elective office and a method of accounting utilizing the respective party na-

tional and state committees. The only other relevant provision, § 441a(a)(4), authorizes the intervenor NRSC to do directly what it has done indirectly here. In what the Supreme Court has termed "an area of the most fundamental First Amendment activities," this is a shaky foundation for the decision my colleagues stretch to reach.

**27.** I submit that the majority fails to grasp the significance of what the Supreme Court did in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in upholding limits on Contributions, but striking down limits on Expenditures. (*See* maj. op. at n. 27.) *Both* are in the First Amendment area. Where contributions are concerned, the evil of the *quid pro quo* is obvious, so the statutory limits are justified. Expenditures are a different matter, for there is no visible corruption when money amplifies free speech; *hence the Court struck down every limitation on Expenditure challenged on First Amendment grounds.* In so doing the Court spoke in terms relevant to the majority's effort to restrict expenditures here:

> "No governmental interest that has been suggested is sufficient to justify the restriction on the quantity of political expression imposed by § 608(c)'s campaign expenditure limitations.
>
> . . . .
>
> "The interest in alleviating the corrupting influence of large contributions is served by the Act's contribution limitations and disclosure provisions rather than by § 608(c)'s campaign expenditure ceilings." (p. 55)
>
> . . . .
>
> "The interest in equalizing the financial resources of candidates competing for federal office is no more convincing a justification for restricting the scope of federal election campaigns."
>
> . . . .
>
> "There is nothing invidious, improper, or unhealthy in permitting such funds to be spent to carry the candidate's message to the electorate.[64]

[64] As an opinion dissenting in part from the decision below noted: "If a senatorial candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communica-

tion? I know of none." 171 U.S.App.D.C., at 268, 519 F.2d, at 917 (Tamm, J.)" [in which this writer joined]. (p. 56)

"The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people—individually as citizens and candidates *and collectively as associations and political committees*—who must retain control over the quantity and range of debate on public issues in a political campaign.

"For these reasons we hold that § 608(c) is constitutionally invalid." (pp. 57–58)

The Court went on to *validate contribution ceilings*, but "[b]y contrast, *the First Amendment requires the invalidation of the Act's independent expenditure ceiling*, § 608(e)(1), its limitation on a candidate's expenditures from his own personal funds, 608(a), *and its ceilings on overall campaign expenditures*, § 608(c). These provisions place substantial and direct restrictions on the ability of candidates, citizens, *and associations* to engage in protected political expression, restrictions that the First Amendment cannot tolerate." (Emphasis added.) *Id.* at 58–59.

The specific holding of *Buckley* was, of course, as the majority suggests (maj. op. at n. 27), to invalidate the *independent* expenditure limitations, not to rule on expenditures of a political party committee—a ruling which, if made, would have left one point of view in the case at bar bereft of any support whatsoever. But surely the language used by the Court, the rationale of sustaining restrictions *only* where there was an obvious evil to be prevented, is highly relevant to our problem here. *Buckley* confirms that *all* of FECA's campaign "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." 424 U.S. at 14, 96 S.Ct. at 632.