IN the MATTER OF M.J.: M.J., Appellant,

v.

MILWAUKEE COUNTY COMBINED COMMUNITY SERVICES BOARD, Respondent.†

Court of Appeals

*No. 84–1263. Submitted on briefs November 7, 1984.—*
*Decided December 27, 1984.*
(Also reported in 362 N.W.2d 190.)

<hr>

† Petition to review denied.

For the appellant the cause was submitted on the briefs of *Robert W. Pledl,* assistant state public defender, of Wauwatosa.

For the respondent the cause was submitted on the briefs of *Robert A. McKnight,* principal assistant corporation counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Brown, JJ.

WEDEMEYER, P.J. M.J. appeals from an order entered April 4, 1984 extending her involuntary mental health commitment for a period of one year pursuant to secs. 51.20(1)(a)2.d[1] and 51.20(1)(am),[2] Stats. M.J.

---

[1] Section 51.20(1)(a)1 and 2, Stats., provides in part:

(a) Every written petition for examination shall allege that the subject individual to be examined:

1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and

2. Is dangerous because the individual:

a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm;

c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. . . . ; or

d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

claims this extension violated sec. 51.20 (13) (g) 2,[3] which she reads as limiting any commitment based on sec. 51.20 (1) (a) 2.d to a maximum length of forty-five days per year. We conclude that a literal reading of sec. 51.20 (13) (g) 2 would produce an absurd result, in that persons who remain dangerous to themselves, as defined by sec. 51.20 (1) (a) 2.d, for more than forty-five days per year would be left without protection. We conclude that this result is inconsistent with the purposes of ch. 51. We therefore hold that the forty-five day limit of sec. 51.20 (13) (g) 2 applies only to the original commitment order and does not bar subsequent extensions of the order beyond forty-five days. We affirm the trial court's order.

M.J. was originally committed to the custody of the Milwaukee County 51.42 Board on February 10, 1984. The trial court found that M.J. was mentally ill, was a proper subject for treatment, and was dangerous to herself as defined in sec. 51.20 (1) (a) 2.d, Stats. The commitment order declares that pursuant to sec. 51.20 (13) (g) 2, the commitment is for a period not exceeding forty-five days.

This appeal concerns an extension of that commitment for a one-year period. In granting the extension, the

---

[2] Section 51.20 (1) (am), Stats., provides in part:

(am) If the individual has been the subject of inpatient treatment for mental illness . . . as a result of a voluntary admission or a commitment or placement ordered by a court under this section . . . immediately prior to commencement of the proceedings, the requirements of a recent overt act, attempt or threat to act under par. (a) 2.a or b, a pattern of recent acts or omissions under par. (a) 2.c or recent behavior under par. (a) 2.d may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

[3] Section 51.20 (13) (g) 2, Stats., provides:

2. Any commitment ordered under par. (a) 3 to 5, following proof of the allegations under sub. (1) (a) 2.d, may not continue longer than 45 days in any 365-day period.

trial court found that M.J. is mentally ill and a proper subject for treatment under secs. 51.20(1)(a)1[4] and 51.20(1)(am),[5] Stats. It further found under sec. 51.20 (1)(am) that if treatment were withdrawn, M.J. would be a proper subject for commitment and dangerous to herself under sec. 51.20(1)(a)2.d. Lastly, it found that based on M.J.'s condition, outpatient treatment would not be appropriate. M.J. appeals.

M.J. points to the four definitions of "dangerousness" set forth in sec. 51.20(1)(a)2.a–2.d, Stats., and notes they are listed in a descending order of seriousness or degree of potential harm to the individual or others. Next M.J. cites sec. 51.20(13)(g)1, wherein it is provided that the initial commitment upon a finding of any one of the first three definitions of "dangerousness" is for a period of six months and may be extended indefinitely for periods of twelve months each.[6] In contrast, under sec. 51.20(13)(g)2, consistent with the descending definitional patterns of "dangerousness," any commitment under the fourth definition of "dangerousness" may not continue longer than forty-five days per year. M.J.'s was found to be "dangerous" under the fourth definition, sec. 51.20(1)(a)2.d. M.J. argues that the language of sec. 51.20(13)(g)2 is plain and unambiguous and clearly prohibits this extension because it would continue the commitment longer than forty-five days. She argues that therefore the trial court was without authority to issue its order. We disagree.

---

[4] *See* note 1, *supra.*

[5] *See* note 2, *supra.*

[6] Section 51.20(13)(g)1, Stats., provides:

(g)1. Except as provided in subd. 2, the first order of commitment of a subject individual under this section may be for a period not to exceed 6 months, and all subsequent consecutive orders of commitment of the individual may be for a period not to exceed one year.

By the enactment of ch. 51, Stats., the legislature of this state declared its intention to provide a full range of treatment and rehabilitative services for all forms of mental disorders. To accomplish this end, it inaugurated a unified system which was designed to relieve the consequences of mental illness through a continuum of care. This approach embodies a two-fold thrust, emphasizing the continuing responsible treatment and care of the mentally ill and the avoidance of institutional care if adequate treatment can be provided in another way. Sec. 51.001.

Under ch. 51, Stats., county governments are given primary responsibility for the well-being, treatment and care of the mentally ill. They are required to establish a community mental health program to be administered by what has become known as a "51.42 board." Within the limits of the resources available, this board must provide for the needs of persons suffering from mental disabilities. The services which must be offered include comprehensive diagnostic and evaluative services, inpatient and outpatient care and treatment, residential facilities, partial hospitalization, emergency care, and supportive transitional services to achieve the ultimate purpose of rehabilitation. Sec. 51.42(5).

Consistent with this purpose, sec. 51.20, Stats., lists prerequisites for and provides the mechanics for treatment by involuntary commitment of the mentally ill. It requires findings that the subject individual is mentally ill, is a proper subject for treatment, and is "dangerous" under any one of the criteria delineated in sec. 51.20 (1) (a)2.a, b, c, or d.

Section 51.20(13) (a)3, Stats., provides that if the findings specified above are made, the court shall order the individual committed to the care and custody of a local 51.42 board. The local board "shall have ongoing responsibility to review the individual's needs . . . and

transfer the person to the least restrictive program consistent with the individual's needs." Sec. 51.20(13)(f), Stats. In discharging this responsibility, the board must comply with sec. 51.20(17). That section requires:

[E]very patient committed involuntarily to a board under this chapter shall be reevaluated by the treatment staff or visiting physician within 30 days after the commitment, and within 3 months after the initial reevaluation, and again thereafter at least once each 6 months for the purpose of determining whether such patient has made sufficient progress to be entitled to transfer to a less restrictive facility or discharge.

Section 51.22(5), Stats., reiterates that the 51.42 board shall provide the least restrictive treatment appropriate to the patient's needs and adjures movement of the patient through "all appropriate and necessary treatment components to assure continuity of care."

A patient's commitment may be extended, under sec. 51.20(13)(g)3., Stats.,[7] if the patient continues to be mentally ill and a proper subject for treatment and meets one of the criteria of sec. 51.20(1)(a)2 or 51.20 (1)(am). Section 51.20(1)(am) provides that in a proceeding to extend a patient's commitment, the requirements of sec. 51.20(1)(a)2 that the acts or omissions relied on must be *recent* behavior may be satisfied by showing that there is a substantial likelihood, based on the patient's treatment record, that he or she would be a proper subject for commitment if treatment were discontinued. The purpose of this provision is to allow

---

[7] Section 51.20(13)(g)3, Stats., provides in part:

Upon application for extension of a commitment by the department or the board having custody of the subject, the court shall proceed under subs. (10) to (13). If the court determines that the individual is a proper subject for commitment as prescribed in sub. (1)(a)1 and evidences the conditions under sub. (1)(a)2 or (am), it shall order judgment to that effect and continue the commitment.

extension of a commitment when the patient's condition has not improved enough to warrant discharge. Because of the therapy received, evidence of recent action exhibiting "dangerousness" is often nonexistent. Therefore, the emphasis is on the attendant consequence to the patient should treatment be discontinued.

Of equal importance is the authority lodged in sec. 51.20(13)(d), Stats. If a patient is found to be mentally ill, a proper subject of treatment, and dangerous, the order of commitment may be modified as set forth in sec. 51.35. Section 51.35 is known as the conditional release provision. It supplies authority to transfer a patient from one treatment facility to another or even back into the community if: (1) the transfer is consistent with reasonable medical and clinical judgment; (2) the venue is the least restrictive alternative appropriate to the patient's needs; and (3) all appropriate and necessary treatment components are provided to assure continuity of care. If the patient is transferred, conditions may be imposed that are intended to benefit the patient.

Finally, under sec. 51.35(4), Stats., the 51.42 board is required to discharge a patient when it determines that he or she no longer meets the standard for recommitment under sec. 51.20(13)(g). It is clear that under this statutory scheme, flexibility and individual treatment are the major factors relied upon to achieve the ultimate goal of rehabilitation and discharge.

We turn now to the construction of sec. 51.20(13)(g) 2, Stats. We look first to the language of the statute itself. "[T]he meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). *Accord,*

*White v. General Casualty Co.*, 118 Wis. 2d 433, 437, 348 N.W.2d 614, 617 (Ct. App. 1984). However, "[a] statute may be plain and unambiguous in its letter, and yet, giving it the meaning thus suggested, it may be so unreasonable or absurd as to involve the legislative purpose in obscurity." *Pfingsten v. Pfingsten,* 164 Wis. 308, 313, 159 N.W. 921, 923 (1916). The supreme court has "repeatedly held that a statute should not be construed so as to work an absurd result even when the language seems clear and unambiguous." *Worachek v. Stephenson Town School District,* 270 Wis. 116, 124, 70 N.W.2d 657, 661 (1955).

Professor Singer observes: "[C]ontrary to the traditional operation of the plain meaning rule, courts are increasingly willing to consider other indicia of intent and meaning *from the start* rather than beginning their inquiry by considering only the language of the act." 2A J. Sutherland, *Statutes and Statutory Construction* sec. 46.07, at 110 (Sands 4th ed. 1984) (emphasis added). When an absurdity or obscurity poses a threat:

> [T]he court may look to the history of the statute, to all the circumstances intended to be dealt with, to the evils to be remedied, to its reason and spirit, to every part of the enactment, and may reject words, or read words in place which seem to be there by necessary or reasonable inference, and substitute the right word for one clearly wrong, and so find the real legislative intent, though it be out of harmony with, or even contradict, the letter of the enactment.

*Pfingsten,* 164 Wis. at 313, 159 N.W. at 923.

We now return to the statutory provisions in issue. Section 51.20 (13) (g) 1 and 2, Stats., reads:

> 1. Except as provided in subd. 2, the *first* order of commitment of a subject individual under this section may be for a period not to exceed 6 months, and *all subsequent consecutive orders* of commitment of the in-

dividual may be for a period not to exceed one year. [Emphasis added.]

2. Any commitment ordered under [s. 51.20(13)](a) 3 to 5, following proof by the allegations under [s. 51.20] (1)(a)2.d, may not continue longer than 45 days in any 365-day period.

Subdivision 1 clearly limits first orders of commitment to a period of six months and limits any subsequent consecutive orders to a period of one year. Subdivision 2 is equally clear that no commitment under sec. 51.20 (1)(a)2.d, the least serious definition of "dangerousness," may continue longer than forty-five days in any 365-day period.

Of paramount clarity, however, when one considers the intention of ch. 51, Stats., and its concern for the continuity of gradually reduced individualized treatment for the purposes of ultimate rehabilitation, is the absurdity that is introduced if the procrustean interpretation espoused by M.J. is allowed to prevail.

Under ch. 51, Stats., the condition and treatment of the patient is the cynosure of legislative concern. Frequent evaluation and retailoring of attention is the methodology employed, with the aim of producing an improved or rehabilitated individual. The literal application of sec. 51.20(13)(g)2 urged by M.J. would require that patients be released regardless of their condition. Treatment would become subservient to a time clock, a concept completely inimical to modern medical precepts. The patient's condition would no longer be the focus of the statutory design. The practical benefits derived from utilizing the flexible conditional relief provisions of sec. 51.35 would be lost. The reasons compelling a 51.42 board to order a discharge under sec. 51.35(4) would be meaningless. Succinctly put, the entire statutory scheme would have lost most of its reason for existence.

The mental health authorities should be and are prevented from continuously pulling an individual from the streets only to release him or her a short time later. The mental health system should not allow what once occurred: a revolving door existence for some, in which the person was brought in and let out, and in and out, without due process and without analyses regarding necessity of treatment. The purpose of sec. 51.20(13)(g)(2), Stats., is to prevent this revolving door. *See* La Fond, *An Examination of the Purposes of Involuntary Civil Commitment*, 30 Buffalo L. Rev. 499–535 (Summer 1981). There should be and is a limitation on the frequency of involuntary commitment for those who fall under sec. 51.20(1)(a)2.d, and that limitation is set by the statute in question here.

This case is not about a revolving door, however. It is not a "frequency" case. The issue is whether mental health personnel can review whether a patient needs further treatment, such that the patient should not be shunted out the door. Our mental health statutes were not designed to force mental health personnel to release those in need of further treatment. As long as the proper requirements of due process are met and a legitimate basis for detaining the individual exists, the mental health system prospers by allowing mental health personnel to continue to help those in need.

We therefore deem it consonant with sound rules of statutory construction to follow the advice of *Pfingsten, supra.* We conclude that the most prudent and reasonable way to avoid frustrating the legislative intent, and at the same time to maintain consistency with sec. 51.20 (13)(g)1 is to read sec. 51.20(13)(g)2 to include the word "first" after the word "any." This will allow prompt review of the patient's condition and at the same time encourage the desired continuity of care.

We agree with the trial court's observation that while M.J.'s position initially holds some allurement, it is too mechanistic in its approach. It ignores the reality of mental health care, the legislature's recognition of mental illness and its avowed purpose to aid in rectifying that condition. We conclude that the trial court's order should be affirmed.

*By the Court.*—Order affirmed.

MOSER, J. (*dissenting*). I agree with the social policy established by the trial court and the majority of this appellate panel, but setting social policy is not the function of trial courts or appellate courts such as this one, whose primary obligation is error correction. Social policy is primarily the duty of the legislative and executive branches of government. The majority here radically changes the social policy established by those branches of government, therefore I respectfully dissent.

Section 51.20(13)(g)2, Stats., clearly, unequivocally, and in plain language, provides that "any commitment" due to mental problems under sec. 51.20(1)(a)2.d may not continue for longer than 45 days in any 365-day period. The social policy clearly is to limit any commitment under this section to 45 days.

Where the plain language of a legislative act is subject to court review, the sole function of the court is to enforce the statute according to its terms. *See Caminetti v. United States,* 242 U.S. 470, 485 (1917); *White v. General Casualty Co. of Wis.,* 118 Wis. 2d 433, 437, 348 N.W.2d 614, 617 (Ct. App. 1984). Words of a statute must be given their obvious and ordinary meaning and courts are not to resort to judicial rules of construction in the absence of ambiguity. *County of Milwaukee v. LIRC,* 113 Wis. 2d 199, 203, 335 N.W.2d 412, 415 (Ct. App. 1983). Even though the statute may appear unreasonable, the plain mandate of the law must prevail.

*See Pfingsten v. Pfingsten*, 164 Wis. 308, 313, 159 N.W. 921, 923 (1916).

Because I believe the words "may not continue longer than 45 days in any 365-day period" in sec. 51.20(13)(g) 2, Stats., are mandatory, as opposed to directory, and because the words are expressed in clear, unequivocal and plain language, they therefore cannot be radically interpreted to obfuscate their obvious and ordinary meaning. I would reverse the trial court because it set its own social policy, as does the majority of this appellate court, which action is contrary to the mandate of the legislative and the executive branches.